J-A09019-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| PLUM HOLLOW HUNTING CLUB, INC. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | |
| v. | |
| LARRY J. DILLMAN AND TINA M. DILLMAN, HIS WIFE, BONNIE M. MILLER, WIDOW, AND DUAINE A. RAMSEY, SINGLE | |
| Appellees | No. 1212 MDA 2015 |

Appeal from the Order Dated June 17, 2015
in the Court of Common Pleas of Fulton County
Civil Division at No(s): 274 of 2006-C

BEFORE:  FORD ELLIOTT, P.J.E., JENKINS, J., and PLATT, J.[*]

MEMORANDUM BY JENKINS, J.:                **FILED AUGUST 09, 2016**

Appellant Plum Hollow Hunting Club, Inc. ("PHHC") appeals from the June 17, 2015 order of the Fulton County Court of Common Pleas entering judgment on behalf of Appellees Larry and Tina Dillman, Bonnie Miller, and Duaine Ramsey (collectively "Appellees"),[1] whom the court previously determined had acquired property adjoining PHHC's property by adverse possession.  After careful review, we affirm.

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] Bonnie Miller and Duaine Ramsey, the Dillmans' neighbors, were added as indispensable parties to PHHC's quiet title action.  Neither Miller nor Ramsey's land borders PHHC.

In its February 6, 2014 Interim Non-Appealable Order and Opinion ("Interim Opinion"), its January 28, 2015 Order and Opinion ("AP Opinion"),[2] and its October 22, 2015 Opinion sur Pa. R. App. P. 1925(a) ("1925(a) Opinion"), the trial court fully and correctly set forth the relevant facts and procedural history of this case; therefore, we have no reason to restate them. **See** Interim Opinion, pp. 2-26; AP Opinion, pp. 1-3; 1925(a) Opinion, pp. 1-4.[3]

Appellant raises the following three (3) claims for review:

1. Whether the trial court erred as a matter of law in determining that Dillman proved every necessary element of adverse possession by clear and convincing evidence for the statutory period of 21 years, especially because the trial court abused its discretion when it failed to find as a material fact that the Encroachment Area was an enclosed woodland[?]

2. Whether the trial court abused its discretion and erred as a matter of law in determining that [the] Dillmans established adverse possession through tacking from their predecessor-in-title when the only act constituting adverse possession by that predecessor was placing a residence on real estate to which plaintiff [PHHC] did not have title and so was never entered upon and ousted[?]

3. Whether the trial court abused its discretion and erred as a matter of law in establishing the southern and eastern boundaries of [the] Dillmans[' property] in common with [PHHC] coextensive with [the] Dillmans' deed calls, as established by

---

[2] We follow the trial court's designation of its January 28, 2015 Order and Opinion as the "AP Opinion".

[3] The AP Opinion incorporates by reference the Interim Opinion. **See** AP Opinion, p. 3. The 1925(a) Opinion repeatedly incorporates both prior opinions. **See** 1925(a) Opinion, pp. 5, 6, 7.

surveyor Thomas Michael Englerth, when there was no showing of adverse possession along those boundaries, and [PHHC] had superior tittle to [the] Dillmans along these common boundaries[?]

Appellants' Brief, p. 3.

Appellant challenges the trial court's entry of final judgment in favor of Appellees. Specifically, Appellant claims the trial court erred by finding Appellees established adverse possession by clear and convincing evidence. We disagree.

> When reviewing a trial court's decision regarding an action to quiet title, [the appellate court is] limited to determining whether the findings of fact that led to the trial court's conclusions of law are supported by competent evidence. Ordinarily, an appellate court will not reverse a determination of the trial court in a quiet title action absent an error of law or capricious disregard of the evidence.

*Birdsboro Mun. Auth. v. Reading Co. & Wilmington & N. R.R.*, 758 A.2d 222, 225 (Pa.Super.2000) (internal quotations and citation omitted).

After a thorough review of the record, the briefs of the parties, the applicable law, and the well-reasoned and thorough opinions of the Honorable Douglas W. Herman, we conclude Appellants' issues merit no relief. The trial court opinions comprehensively discuss and properly dispose of the questions presented. *See* Interim Opinion, pp. 26-74; AP Opinion, pp. 3-9; 1925(a) Opinion, pp. 4-7 (finding: PHHC sufficiently demonstrated the location of the Mary Trotter Patent, which controls; PHHC sufficiently demonstrated its chain of title back through the Mary Trotter Patent; Appellees acquired title to all improved property by adverse possession;

- 3 -

Appellees further acquired title to all property intersecting the Mary Trotter Patent, as set forth in their respective deeds, by adverse possession).

Accordingly, we affirm on the basis of the trial court opinions.

Order affirmed.

Judgment Entered.

_Joseph D. Seletyn_
Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/9/2016

**THE COURT OF COMMON PLEAS OF THE 39th JUDICIAL DISTRICT
OF PENNSYLVANIA – FULTON COUNTY BRANCH**

| | |
|---|---|
| Plum Hollow Hunting Club, Inc., and<br>Douglas Henry,<br>        Plaintiffs<br><br>    vs.<br><br>J. Ronald Fraker, Dulce Burger Hall,<br>Bonnie M. Miller, Michael R.<br>Weaver and Rhonda R. Weaver, his<br>wife, Duaine A. Ramsey, single, and<br>Larry J. Dillman and Tina M.<br>Dillman, his wife,<br>        Defendants | Civil Action<br><br><br>No. 376-2008<br><br><br>Judge Douglas W. Herman |

FULTON COUNTY
PENNSYLVANIA
FILED

**JAN 2 8 2015**

PROTHONOTARY. CLERK OF COURTS,
CLERK OF ORPHANS COURT,
REGISTER OF WILLS, RECORDER OF DEEDS

| | |
|---|---|
| Plum Hollow Hunting Club, Inc.,<br>        Plaintiff<br><br>    vs.<br><br>Larry J. Dillman and Tina M.<br>Dillman, his wife, Bonnie M. Miller,<br>widow, and Duaine A. Ramsey,<br>single,<br>        Defendants | Civil Action<br><br><br>No. 274-2006<br><br><br>Judge Douglas W. Herman |

## OPINION

This is a boundary dispute case involving Plaintiffs, Plum Hollow Hunting Club

("Hunting Club") and Douglas Henry ("Henry"), and Defendants, J. Ronald Fraker ("Fraker"),

Bonnie M. Miller ("Miller"), Michael R. Weaver and Rhonda R. Weaver ("the Weavers"),

Duaine A. Ramsey ("Ramsey"), and Larry J. Dillman and Tina M. Dillman ("the Dillmans").

On February 6, 2014 this Court issued an Interim Non-Appealable Order and Opinion ("Interim

Opinion") which, in part, decided that the Defendants have satisfied their burden of proving

adverse possession for the land that has been improved. However, questions remain regarding




adverse possession of any unenclosed woodland adjoining the properties. The Court deferred ruling on where the boundaries between the parties' respective properties lie to allow the parties to reach an agreement as to those terms. The parties have failed to reach an agreement and so the issue is now before the Court.

## PROCEDURAL HISTORY

This Opinion relates to case nos. 274 of 2006 and 376 of 2008. On September 12, 2006 (no. 274 of 2006), November 14, 2008 (no. 376 of 2008), and February 5, 2009 (no. 40 of 2009) the Plaintiffs filed complaints. On November 2, 2006 the Defendants Dillmans filed an Answer in case no. 274 of 2006. On January 20, 2009 the Defendants filed an Answer in case no. 376 of 2008. On March 18, 2009 the Defendants filed an Answer with New Matter and Counterclaim in case no. 40 of 2009.

The Court convened a bench trial on May 18 to May 20, 2011, July 26, 2011, July 29, 2011 and August 25, 2011. After consideration of the evidence of record and the arguments of counsel the Court issued an Interim Non-Appealable Order and Opinion on February 6, 2014. In that Opinion we concluded that pursuant to the Mary Trotter Patent the Plaintiffs hold legal title to those portions of land that overlap with the land described in the Defendants' deeds. Furthermore, we concluded that the Defendants' were entitled to ownership of the intersecting property by way of adverse possession of any improved land but the Court purposely left undecided where the boundaries of the properties obtained by adverse possession would lie to allow the parties to come to an agreement.[1] Specifically, the Court did not decide whether the Defendants were entitled to ownership of any unenclosed woodland adjoining their properties. The parties have failed to come to an agreement and therefore the issue is now before the Court.

---

[1] Regarding Fraker and his grantees' title the Court stated: "Except for the adverse possession and the doctrine of consentable lines, any interference between the Survey of 1976 and the Mary Trotter patent is resolved in favor of those holding title through Mary Trotter." Interim Opinion at 54.

2

The instant Opinion pertains only to case nos. 274 of 2006 and 376 of 2008 and focuses on the issue remaining from the Interim Opinion, i.e., the boundaries between the parties' respective properties in the context of ownership by adverse possession. This matter is now ready for a decision.

## DISCUSSION

For purposes of this Opinion we incorporate all findings of fact and conclusions of law delineated in the Court's Interim Opinion.[2] In the Interim Opinion we found that the Dillmans, Ramsey, Miller, and Dulce Burger Hall ("Fraker Defendants") have satisfied their burden of proving adverse possession for the land that has been improved. In order to decide the boundaries of the properties we now must decide whether the Defendants have obtained title to any adjoining unenclosed woodland within the Mary Trotter patent ("Encroachment Area") by adverse possession.

As we expounded upon in the Court's Interim Opinion, adverse possession is defined as "dominion over the property." Bride v. Robwood Lodge, 713 A.2d 109, 112 (Pa. Super. Ct. 1998). To establish adverse possession, the person asserting it must prove actual, continuous, exclusive, visible, notorious, distinct and hostile possession of the land which it seeks title to for a period of 21 years. Moore v. Duran, 687 A.2d 822, 828 (Pa. Super. Ct. 1996).

"Actual possession of property may be established in connection with the maintenance of a residence, by cultivation of the land, by [e]nclosure of the land, or by making improvements to the land and paying property taxes." Moore, 687 A.2d at 828; see also Parks v. Pennsylvania R.R. Co., 152 A. 682, 684 (Pa. 1930) ("temporary acts on the land, without an intention to seat it for residence and cultivation or other permanent use consistent with the nature of the property are not the actual possession required"). Proof of "actual possession" is not to be mistaken for

---

[2] Pages 63 to 70 of the Interim Opinion discuss adverse possession.

3

proof of constructive possession under the guise of color of title. <u>Inn Le'Daerda, Inc. v. Davis</u>, 360 A.2d 209, 214 (Pa. Super. Ct. 1976). However, importantly for this case, "a disseisor who enters under 'color of title' and demonstrates actual possession for the requisite twenty-one year period, of a portion of property described in the invalid instrument, may thereby establish constructive possession of entire tract described therein." <u>Beck v. Beck</u>, 648 A.2d 341, 343 (Pa. Super. Ct. 1994); <u>see also</u> <u>Arcadia Co.. v. Peles</u>, 576 A.2d 1114, 1117 (Pa. Super. Ct. 1990) ("[a]lthough it contributes nothing to the fiber of title as affecting the adverse character of possession, id., a disseisor who enters upon and cultivates part of a tract for the limitations period (i.e., for twenty-one years), may thereby hold constructive possession of the whole tract if his entry was by color of title"). It must be noted however, "the possession of one who has a colorable title is co-extensive with the boundaries of the instrument under which he claims only in the absence of any actual possession by the true owner." <u>Arcadia</u>, 576 A.2d at 1117.

> [and where one party] enters upon unoccupied land, under a deed or title, and holds adversely, his possession is construed to be coextensive with his deed or title, and the true owner will be deemed to be disseised to the extent of the boundaries described in that title. Still, his possession beyond the limits of his actual occupancy is only constructive. If the true owner be at the same time in actual possession of part of the land, claiming title to the whole, he has the constructive possession of all the land not in the actual possession of the intruder, and this though the owner's actual possession is not within the limits of the defective title.

<u>Id.</u> (quoting <u>Inn Le'Daerda</u>, 360 A.2d at 213-14).

When the claimed property is woodland, Pennsylvania courts have adopted "a rather strict standard for proving adverse possession." <u>Shaffer v. O'Toole</u>, 964 A.2d 420, 424 (Pa. Super. Ct. 2009). In "dealing with a woodland, a person must establish actual possession of the woodland by residence or cultivation of a part of the tract of land to which the woodland belongs. A property owner can satisfy this requirement by making ordinary use of the woodlands in connection with their residence or the part of the woodlands that is cultivated.

4

Olewine v. Messmore, 18 A. 495, 496 (Pa. 1889); see also Bride v. Robwood Lodge, 713 A.2d 109, 112 (Pa. Super. Ct. 1998) ("[s]ince the disputed parcel is undeveloped woodland, actual possession is established by either erecting a residence or by enclosing and cultivating the property"); Moore, 687 A.2d at 828 ("[a]ctual possession may thus be established by enclosing and cultivating the tract of land of which the woodland is a part without erecting a residence; or possession may be established by erecting a residence where there is a clear designation of the boundaries of the land surrounding such residence"); Hole v. Rittenhouse, 37 Pa. 116, 117 (1860) ("actual possession may be a residence without cultivation, or by enclosure and cultivation without residence; and where either these is, the use of adjoining woodland by the disseisor, as farmers generally use woodland adjoining their farms, is actual and not constructive possession of such woodland").

In determining whether a claimant has established the requisite 21 years of possession the concept of tacking may be applicable. Inn Le'Daerda, 360 A.2d at 214. Tacking consists of combining the possession of a claimant with that of his predecessor in title and it is permitted where the possessions are continuous. Id. Furthermore, "[e]ach predecessor must have claimed title to the property in dispute, and in transferring to his successor must have purported to include it. Id. That is, the deed to the successor must contain a description of the land claimed. See id.

In the Interim Opinion we stated "[t]he Court agrees with the Defendants that adverse possession has been satisfied for the land that has been improved,"[3] and stated our reasons why, citing testimony by Allen Henry and Fraker as well as other photographic evidence presented in Exhibits I-2 through I-9. Such improvements on the property of the Fraker Defendants land include dwellings and structures on the land, driveways, and neatly groomed front and back yards. Thus, the Fraker Defendants have established the requisite elements of adverse

---

[3] Interim Opinion at 67.

5

possession for improved land. We now discuss purported improvements to any unenclosed woodland adjoining the Fraker Defendants' properties to determine whether the Fraker Defendants have obtained title to that property by adverse possession and to set boundaries between the properties.

Plaintiffs did not actually possess the portions of land where the Encroachment Area intersects with the Fraker Defendants' properties from the time Fraker acquired the property. Nor do the disputed areas consist of unenclosed woodland. Therefore, Fraker's and the Fraker Defendants' actual and constructive possession of the disputed land that is described within their deeds is sufficient to establish adverse possession of the land, as set forth more fully below. Beck, 648 A.2d at 343; Arcadia, 576 A.2d at 1117.

## I. Bonnie Miller

Fraker acquired his property by deed dated June 28, 1976. On May 9, 1985 Fraker conveyed the property to Miller by deed ("Miller Deed"). Plaintiffs filed their lawsuit on November 17, 2008. Therefore, Miller was in possession of her property for over 21 years prior to the commencement of the action. Exhibit 124, a reconstruction of the Mary Trotter Patent, shows that a small portion of Miller's front yard is within the Encroachment Area. As we alluded to in the Interim Opinion, Miller has established adverse possession of all improved land by way of photographic evidence in Exhibits I-2 through I-9 and the testimony of Fraker and Allen Henry. The small portion of the front yard that is within Encroachment Area consists of land that has been improved. That is, there is no unenclosed woodland within the perimeter described in the Miller Deed that overlaps with the Encroachment Area. Plaintiff's expert witness, Mr. Witter testified that Miller's trailer, outbuildings, and other improved areas of her property are the portions of property that are within the Encroachment Area.

6

Plaintiff argues that <u>Inn Le'Daerda</u> stands for the proposition that Miller did not establish adverse possession. We disagree. In that case the Superior Court noted that trailers were installed by Marshall's predecessors in title on a disputed strip of land, they remained there, and the property was maintained, The Court ruled that adverse possession was established by tacking Marshall's possession with that of his predecessors in title which equated to more than 21 years. Like <u>Inn Le'Daerda</u>, Fraker installed a trailer in the Encroachment Area and Miller maintained it when she acquired the property from Fraker and therefore Fraker's possession tacks onto Miller's possession for over 21 years. As such, Miller has acquired title to all land described within the Miller Deed by adverse possession.

## II. <u>Dulce Hall</u>

On May 15, 2003 Dulce Hall acquired his property from Miller who conveyed part of the property that she acquired form Fraker. Hall's property is comprised of the property that Miller acquired from Fraker. Just as Fraker's possession tacked onto Miller's possession of the property, Hall's possession will tack onto Miller's possession, as the deeds purport to convey the same property. By way of tacking, Hall has acquired title to all land described within the Miller Deed by adverse possession.

## III. <u>Duaine Ramsey</u>

On January 27, 1989 Fraker conveyed the Ramsey property to Ubertie and Geraldine Shockey and on October 23, 2001 Shockey conveyed this lot to Ramsey. Plaintiff's expert witness Mr. Witter testified that the improved areas of Ramsey's property lie within the Encroachment Area. Mr. Witter did not testify to the exact location of the intersection of the Encroachment Area and Ramsey's property, as he testified that "we have no exact distance per se." Based on the testimony of Allen Henry pertaining to the location of the Mary Trotter line

7

and Exhibit 124, the Mary Trotter line crosses the Ramsey property between Plum Hollow Road and Ramsey's house, being parallel to Plum Hollow Road. Thus, the portion of the Ramsey property that is within the Encroachment Area is improved and has been improved since the time that Fraker owned it as we concluded in the Interim Opinion. Therefore, Ramsey has acquired title to all land described within the Miller Deed by adverse possession.

## IV. The Dillmans

Fraker conveyed the Dillmans property to the Dillmans on September 26, 1986. The testimony of Allen Henry, along with the photographic evidence which we discussed in the Interim Opinion, establishes that the Dillmans own all of the property described in their deed that intersects with with the Encroachment Area by way of adverse possession. Allen Henry testified to the following:

> Q. Before we move on, who was in actual physical possession of the Dillman property when this action was filed by the plaintiffs in 2009?
> A. Dillman was in actual physical possession of whatever is inside the Mary Trotter boundary in my opinion.
> He occupied—it's my understanding he occupied the house and so he was also in physical possession of that house, but at the time he purchased [it] I understand the title was still in someone through Mary Trotter because the house was on the property that was conveyed to him by Fraker. The house is on that property.

N.T. May 19, 2011 at 116. Allen Henry, a plaintiff witness, believes that the Dillmans were in physical possession of any land within the Encroachment area. His testimony also establishes that the house was there prior to the Dillmans acquisition of the property. Aside from the Dillmans' driveway, Mr. Witter did not identify any other portion of the Dillmans' property that would lie within the Encroachment Area. Exhibit 124 shows that only a portion of the Dillmans' front yard is within the Encroachment Area. When shown photographs of the Dillmans' house and garage (Fraker Exhibit I-1), the Dillmans' side yard (Fraker Exhibit I-2), and a front view of the house (Fraker Exhibit I-3) and asked where the Dillmans' property intersected with the Mary

8

Trotter line, Allen Henry testified that "it is clear I think it is between the garage and the road." N.T. May 19, 2011 at 115. Thus, the Court concludes that the area of the Dillman's property that intersects with the Encroachment Area is improved and therefore the Dillmans have adversely possessed the land. As with the other deeds the deed conveying the property to the Dillmans purported to convey property within the Encroachment Area and therefore the Dillmans' possession of that property tacks onto the possession of their predecessor in title, Fraker.

There is also a question relating to the boundary of the Dillmans' property and the Hunting Club's property that is not within the Encroachment Area. Mr. Englerth testified as to this boundary line. Mr. Englerth testified that he constructed Fraker Exhibit A-1 based upon the deeds of the Plaintiffs and Defendants in the case, and he further testified in detail regarding his construction of the line and his testimony was not challenged by the Plaintiffs' expert witness, Mr. Witter. Mr. Englerth testified that in constructing the exhibit he found numerous field monuments corresponding to the property lines described in the Hunting Club deed and the Dillmans' deed. He concluded that the property line between the Hunting Club and the Dillmans is displayed as the black line on Fraker Exhibit A-1. Mr. Englerth's undisputed testimony establishes that the boundary between the Hunting Club and the Dillmans that lies outside the Encroachment Area is the black line on Fraker Exhibit A-1. Accordingly, the Dillmans have acquired title to all land described within their Deed that intersects with the Encroachment Area by adverse possession. As to the boundary line between the Dillmans and the Hunting Club's property that lies outside of the Encroachment Area, the boundary is established by the black line pursuant to Fraker Exhibit A-1.

9

## CONCLUSION

The boundaries of the parties' respective properties will be set according to the foregoing discussion. An Order consistent with this Opinion is attached.

10

IN THE COURT OF COMMON PLEAS OF THE 39TH JUDICIAL DISTRICT
OF PENNSYLVANIA - FULTON COUNTY BRANCH

| | | |
|---|---|---|
| Plum Hollow Hunting Club, Inc., | : | Civil Action — Law |
| And Douglas Henry, | : | |
| Plaintiffs | : | |
| | : | |
| vs. | : | No. 40 of 2009 C |
| | : | |
| Janet M. Fraker, | : | |
| Defendant | : | Judge: Douglas W. Herman |

IN THE COURT OF COMMON PLEAS OF THE 39TH JUDICIAL DISTRICT
OF PENNSYLVANIA - FULTON COUNTY BRANCH

| | | |
|---|---|---|
| Plum Hollow Hunting Club, Inc., | : | Civil Action — Law |
| And Douglas Henry, | : | |
| Plaintiffs | : | |
| | : | |
| vs. | : | No. 376-2008 -C |
| J. Ronald Fraker, Dulce Burger Hall, | : | |
| Bonnie M. Miller, Duaine A. Ramsey, single | : | |
| Ramsey, single, and Larry J. Dillman and | : | |
| Tina M. Dillman, his wife, | : | |
| Defendants | : | Judge: Douglas W. Herman |

IN THE COURT OF COMMON PLEAS OF THE 39TH JUDICIAL DISTRICT
OF PENNSYLVANIA - FULTON COUNTY BRANCH

| | | |
|---|---|---|
| Plum Hollow Hunting Club, Inc., | : | Civil Action — Law |
| Plaintiff | : | |
| | : | |
| vs. | : | No. 274-2006 C |
| | : | |
| Larry J. Dillman and Tina M. Dillman, | : | |
| His wife, Bonnie M. Miller, widow and | : | |
| Duaine A. Ramsey, single | : | |
| Defendants | : | Judge: Douglas W. Herman |

## INTERIM NON-APPEALABLE ORDER

NOW THIS ___6___ day of February 2014, the Court hereby orders that the attached

1

EXHIBIT

1

Opinion be filed of record. This is not a final appealable Order for the reason that the Court did not decide all the issues raised by the parties. Specifically, with regard to the issue of adverse possession the Court request that the parties attempt to reach a mutual agreement s to the remaining boundaries.

**THE COURT HEREBY** directs that counsel for the parties and the pro se defendants will appear before the Court for a settlement conference on **Tuesday, February 25, 2014 at 2:30 o'clock, p.m.,** in the Courtroom of the Fulton County Courthouse, McConnellsburg, Pennsylvania.

Pursuant to the requirements of Pa.R.C.P. 236 (a)(2),(b),(d), the Prothonotary shall give written notice of the entry of this Order, including a copy of this Order, to each parties' attorney of record and shall note in the docket the giving of such notice and the time and manner thereof.

By the Court,

Douglas W. Herman, P.J.

The Prothonotary shall give notice to:
J. McDowell Sharpe, Esquire
William C. Cramer, Esquire
Joseph A. Macaluso, Esquire
David A. Ody, Esquire, for Tina M. Dillman
Pro Se Defendant Larry J. Dillman
Pro Se Defendant Bonnie M. Miller
Matthew Sembach, Esquire

2

IN THE COURT OF COMMON PLEAS OF THE 39TH JUDICIAL DISTRICT
OF PENNSYLVANIA – FULTON COUNTY BRANCH

| | | |
|---|---|---|
| Plum Hollow Hunting Club, Inc., and, Douglas A. Henry | : | Civil Action – Law |
| Plaintiffs | : | |
| | : | |
| v. | : | No. 40 of 2009-C |
| | : | |
| Janet M. Fraker | : | |
| Defendant | : | Honorable Douglas W. Herman |

IN THE COURT OF COMMON PLEAS OF THE 39TH JUDICIAL DISTRICT
OF PENNSYLVANIA – FULTON COUNTY BRANCH

| | | |
|---|---|---|
| Plum Hollow Hunting Club, Inc., and, Douglas A. Henry | : | Civil Action – Law |
| Plaintiffs | : | |
| | : | |
| v. | : | No. 376 of 2008-C |
| | : | |
| J. Ronald Fraker, Dulce Burger Hall, Bonnie M. Miller, Michael R. Weaver and Rhonda R. Weaver, his wife, Duaine A. Ramsey, single, and Larry J. Dillman and Tina M. Dillman, his wife, | : | |
| Defendants | : | Honorable Douglas W. Herman |

IN THE COURT OF COMMON PLEAS OF THE 39TH JUDICIAL DISTRICT
OF PENNSYLVANIA – FULTON COUNTY BRANCH

| | | |
|---|---|---|
| Plum Hollow Hunting Club, Inc., and, Plaintiff | : | Civil Action – Law |
| | : | |
| v. | : | No. 274 of 2006-C |
| | : | |
| Larry J. Dillman and Tina M. Dillman, his wife, Bonnie M. Miller, widow, and Duiane A. Ramsey, single | : | |
| Defendants | : | Honorable Douglas W. Herman |

## OPINION

## Procedural History

Before the Court are three separate causes of action that are being considered simultaneously. On September 12, 2006 (No. 2006-274), November 14, 2008 (No. 376-2008), and February 5, 2009 (No. 40-2009) the Plaintiffs filed *Complaints*. The *Defendant's Answer with New Matter and Counterclaim* in No. 40-2009 was filed March 18, 2009. In No. 376-2008 *Defendant's Answer* was filed on January 20, 2009. In No. 2006-274 *Defendant Larry Dillman's Answer* was filed November 2, 2006.

The Court convened a bench trial on May 18 to May 20, 2011, July 26, 2011, July 29, 2011 and August 25, 2011. Throughout trial Plaintiffs, Plum Hollow Hunting Club, Inc. and Douglas A. Henry were represented by J. McDowell, Sharpe and the law firm of Sharpe and Sharpe, LLP. Defendant Janet M. Fraker was represented by Joseph A. Macaluso, Esquire and Defendant J. Ronald Fraker was represented by William C. Cramer, Esquire. While Defendants, Larry J. Dillman and Duaine Ramsey did not actively participate in the cross examination of witnesses or present any witnesses of their own, they did testify on their own behalf. See Notes of Testimony, July 29, 2011, p. 74 to 114 for Defendant Larry J. Dillman and Notes of Testimony, July 29, 2011, p. 114 to 131 for Defendant Duaine Ramsey. The remaining defendants, despite proper notice, did not appear or present any testimony. Upon consideration of all evidence of record and the arguments of counsel, the Court enters the following findings of fact and conclusions law:

## Findings of Fact[1]

---

[1] As more fully discussed *infra*, the Defendants have done nothing to rebut the foregoing conclusions of fact.

2 .

1.    An application for thirty (30) warrants, including John Trotter, Mary Trotter, and Elwin Fish was processed by the Land Office on March 1, 1794 and resulted in the issuance of a warrant for John Trotter, Mary Trotter, and Elwin Fish. *Plaintiffs' Exhibit 25.*

2.    John Trotter, Mary Trotter, and Elwin Fish (hereinafter "Trotter-Fish") each secured a warrant for 400 acres of land in Dublin Township, Bedford County (now Fulton County), Pennsylvania.

3.    The warrant issued to John Trotter on March 1, 1794 was for 400 acres of land adjoining land granted to William Rhea the same day in Dublin Township, Bedford County. *Plaintiffs' Exhibit 42.*

4.    The warrant issued to Mary Trotter on March 1, 1794 was for 400 acres of land adjoining land granted to John Trotter the same day in Dublin Township, Bedford County. *Plaintiffs' Exhibit 23.*

5.    The warrant issued to Elwin Fish on March 1, 1794, was for 400 acres of land adjoining land granted to Mary Trotter the same day in Dublin Township, Bedford County. *Plaintiffs' Exhibit 100.*

6.    The Trotter-Fish warrants were indexed and registered in the Warrant Register under the heading "Bedford County". *Plaintiffs' Exhibit 24.*

7.    George Woods Jr., in his capacity as Deputy Surveyor for Bedford County, completed a survey of the Mary Trotter Warrant on March 12, 1794. *Plaintiffs' Exhibit 22.*

3

8.    The Mary Trotter Warrant was patented for 440 acres plus a six percent (6%) allowance for roads. Said patent was enrolled on June 26th, 1805. *Plaintiffs' Exhibit 20.*

9.    George Woods Jr., in his capacity as Deputy Surveyor for Bedford County, completed a survey of the John Trotter Warrant on March 12, 1794. *Plaintiffs' Exhibit 41.*

10.   The John Trotter Warrant was patented for 425 acres plus a six percent (6%) allowance for roads. Said patent was entered on September 30th, 1805. *Plaintiffs' Exhibit 40.*

11.   George Woods Jr., in his capacity as Deputy Surveyor for Bedford County, completed a survey of the Elwin Fish Warrant on March 12, 1794. *Plaintiffs' Exhibit 100, p. 2.*

12.   The Elwin Fish Warrant was patented for 436 acres and 34 perches plus a six percent (6%) allowance for roads. Said patent was enrolled on June 25th, 1805. *Plaintiffs' Exhibit 100, p. 1.*

13.   The Trotter-Fish patents were indexed and entered into the Patent Register. *Plaintiffs' Exhibit 21, p. 1-2.*

14.   The description in the patent of the Mary Trotter Warrant to Ezekiel King contains errors such that the patent does not close. All calls, courses and distances in the Mary Trotter survey are the same as those in the Mary Trotter patent. *Plaintiffs' Exhibits 20, 22.*

15.   The Mary Trotter survey and the John Trotter survey share a part of a common boundary with the bearing in the John Trotter survey calling for North 56 West.

4

The bearing in the Mary Trotter survey calls for South 56 West. *Plaintiffs' Exhibits 39, 40.*

16. On the depiction shown on the Mary Trotter survey, the angle between the line with bearing North 25 East and the line with bearing North 46 West is nearly right angle in the official survey. *Plaintiffs' Exhibits 22, 121.*

17. A plot of the Mary Trotter patent using North 46 West shows an angle that is not a right angle but rather an obtuse angle. Holding that course to North 46 West moves the property lines on the adjacent boundary between Mary Trotter and Elwin Fish to the error and changing the course to North 64 West makes the line match the historical and existing property lines. *Plaintiffs' Exhibit 146.*

18. The Thomas Stinson Patent, which lies to the south of this course and bearing, as more fully described infra, made the transposition from North 46 West to North 64 West. The Deed of 1827 and the Deed of 1865 make a similar change.

19. Transposition of digits in a number is a common error in drafting a survey. *Notes of Testimony, July 26, 2011, p. 15.*

20. After the course is corrected to match the John Trotter bearing and the course is transposed to mirror the angle on the survey, there is an error of closure of 25.77 perches along the eastern boundary of the Mary Trotter boundary. *Plaintiffs' Exhibit 121.*

21. By making the adjustments in the courses and adjusting for the closure error, the Mary Trotter patent description closes, the survey is mirrored, and the plotted acreage of the patent is 467.67 acres. *Plaintiffs' Exhibit 146.*

5

22. The Mary Trotter Patent is the final link in the chain of title for Plaintiff Plum Hollow Hunting Club, Inc., Plaintiff Douglas A. Henry and Defendant Janet M. Fraker.

Relating to the location of the Mary Trotter Patent

23. George Woods Jr. in his capacity as Deputy Surveyor for Bedford County, completed the surveys on March 12, 1794 upon the "Trotter-Fish" warrants issued on March 1, 1794, with the Mary Trotter warrant depending on the John Trotter warrant and the Elwin Fish depending on the Mary Trotter warrant; the John Trotter warrant calls for the Mary Trotter warrant and the Mary Trotter warrant calls for the Elwin Fish warrant. *Plaintiffs' Exhibit 121.*

24. Plaintiff's expert, Timothy Witter, was able to locate sufficient points to locate the Mary Trotter patent, and the John Trotter and Elwin Fish patents, which he used to locate the Mary Trotter patent. More specifically:

a. He located a point at a common corner, referred to as the "Four Corners" in which the northwest corner of the Mary Trotter patent and the southwest corner of the Elwin Fish patent meet the northeastern corner of the Thomas Stinson patent and the southeastern corner of the Charles Sewell patent. *Plaintiffs' Exhibit 123.*

b. He located a planted stone in the western boundary of the Elwin Fish patent. *Plaintiffs' Exhibit 122.*

c. The existence of fence fragments adjacent to the area described by the Deed of 1865[2]. *Plaintiffs' Exhibits 124, 127, 133*

d. The location of the Survey of 1865. *Plaintiffs' Exhibits 60, 123.*

---

[2] Referred to as the "Horn"

6

e. He surveyed along the southern border of the John Trotter patent and was able to establish the location of that boundary line. *Plaintiffs' Exhibit 125*

f. His location of the tributary of the Plum Run in the area that would cross the eastern boundary of the Thomas Stinson patent/western boundary of the Mary Trotter patent at the Horn on the South 25 West (North 25 East) 16 perch line. *Plaintiffs' Exhibit 124*

g. The location of the Holland tract. *Plaintiffs' Exhibits 54, 123, 117;* and

h. The corner agreed on, with Defendant J. Ronald Fraker at a white oak. *Plaintiffs' Exhibit 123.*

25. Mary Trotter's northwest corner is the same as the southwest corner of Elwin Fish and the northern boundary of the Mary Trotter patent runs along the southern boundary of the Elwin Fish patent. *Plaintiffs' Exhibit 131.*

26. A survey made for Ephraim Ramsey by A.J. Fore on November 24, 1865 (*Plaintiffs' Exhibit 60*) subdivided a parcel of land out of the Thomas Stinson survey into a tract with three (3) courses in the Littleton Road as a new monument, operating as the common boundary between the two tracts. Ramsey conveyed the parcel south of the Littleton Road to Thomas Walker in the Deed of 1865 as demonstrated by Plaintiff's Exhibit 58. On February 26, 1869, Ramsey conveyed to William Peters the parcel north of the road with a description using adjoiners. *Plaintiffs' Exhibit 59.* This parcel is now in the chain of title referred to as the "Henry Farm".

27. The existence of the stream as shown on the Survey of Mary Trotter (*Plaintiffs' Exhibit 22*) and as still exists on the ground now provides a physical limitation

7

that requires the stream to intersect the western boundary of the Horn of Mary Trotter, *Plaintiffs' Exhibit 124*.

28.    The courses describing the eastern boundary of the Walker tract match those in the western boundary of the Mary Trotter survey. *Plaintiffs' Exhibit 133*. The Walker description includes the Littleton Road as a monument on the north but is silent regarding the road in the Horn area thereby concurring with his processor Thomas Stinson's survey which also failed to include the road frontage.

29.    Defendants' expert Thomas Englerth, specifically agreed to the Plaintiffs' expert location of the Deed of 1865 which constitutes, until the Survey of 1976, the most recent metes and bounds description of Defendant J. Ronald Fraker's title. *See Notes of Testimony, July 26, 2011, p. 143*.

30.    The location of the Mary Trotter patent is fixed as set forth on Exhibit A of *Plaintiffs' Exhibit 121* and supported by *Plaintiffs' Exhibits 122-125*.

31.    All of Defendant Janet M. Fraker's real estate is located within the Mary Trotter patent as discussed *infra* and the northern portion of the Appleby Tract of Plum Hollow's real estate is also located within the boundary of the Mary Trotter patent as discussed *infra*.

Relating to Plum Hollow Hunting Club, Inc.'s Chain of Title to Owen Anderson

32.    The record title for Plum Hollow Hunting Club, Inc. (hereinafter "Plum Hollow") can be traced to two (2) adjoining tracts of land first described by a subdivision made by Owen H. Anderson and Opal, his wife, with one tract conveyed to A.G. Kerlin (hereinafter "A.G. Kerlin Tract") in 1917, containing ninety (90) acres, more or less, and a second tract to the north conveyed to James Appleby (hereinafter "Appleby Tract") in

8

1919, containing 180 acres, more or less. The Appleby Tract actually contains 230 acres, more or less, as discussed *infra*.

33.     The deed for the Appleby Tract (hereinafter "Appleby Tract") (*Plaintiffs' Exhibit 8*), dated March 22, 1919, and each subsequent deed thereafter, in an unbroken chain of title (hereafter "Appleby Chain"), calls for adjoiner found in the J. Ronald Fraker grantees chain of title (hereinafter "JRF grantee chain"), and also calls for an adjoiner in the JMF chain of title (hereinafter "JMF chain"). *See Plaintiffs' Exhibit 8.*

34.     The deed for the A.G. Kerlin Tract (hereinafter "A.G. Kerlin Deed") (*Plaintiffs' Exhibit 34*), dated May 29, 1917, calls for Elijah Baldwin on the east, but each subsequent deed in an unbroken chain of title (hereinafter "A.G. Kerlin Chain") does not call for any adjoiner in Defendants' chains of title. The deed does not call for other lands of Owen Anderson (later the Appleby Tract) on the north. *Plaintiffs' Exhibit 34.*

Relating to Plum Hollow Hunting Club, Inc.'s Chain of Title from Owen Anderson through James Kerlin

35.     Owen H. Anderson acquired title from his mother Celia Anderson by deed, containing 140 acres, more or less, and a second deed for an adjoining tract of land from Job L. Garland, High Sheriff of Fulton County (hereinafter "Garland Deed") (*Plaintiffs' Exhibit 9*), containing 180 acres, more or less, sold as the land of Celia Sipes (formerly Celia Anderson). The Garland deed called for the Elliott Fleming heirs as an adjoiner who is in the JRF grantee chain and Elijah Baldwin who is in the JRM chain. These two (2) tracts were combined and subdivided using a different common boundary into the Appleby Tract and the A.G. Kerlin Tract as discussed *supra*.

36.     Celia Anderson acquired title to the real estate described *supra* from Harrison Grove Adm. CTA of Ephraim Anderson by deed dated June 25, 1911,

9

containing 286 acres, more or less, and consisting of two (2) adjoining parcels. *See Plaintiffs' Exhibit 11.* The Grove deed called for T.E. Fleming heirs or devisees as adjoiners to the north in the JRF grantee chain and for Elijah Baldwin as adjoiner on the east in the JRM chain. *Plaintiffs' Exhibit 11.*

37. No deed of record was found into Ephraim Anderson, but the following recitals found in the respective deeds reference the deed(s) from James Kerlin to Ephraim Anderson for the two (2) adjoining tracts in the Grove Deed.

a. The Anderson deed, identified as Plaintiff's Exhibit Number 10, recites, "being the same land which was conveyed by Samuel Kelso, Executor of John P. Baker to James Kerlin by deed dated April 6, A.D., 1869 and conveyed by James Kerlin to Ephraim Anderson and the said Anderson died seized of the same land after having made his last will and testament." *Plaintiffs' Exhibit Number 10.*

b. The Appleby Deed, labeled as Plaintiff's Exhibit 8, recites that it is identified as Plaintiff's Exhibit 8, "part of the same land which James Kerlin died seized and afterwards becoming the property of Celia Anderson and later Celia Sipes." *Plaintiffs' Exhibit Number 8, p. 2.*

c. The A.G. Kerlin Deed, labeled as Plaintiff's Exhibit 34, recites that it is "part of the same land which was conveyed by James Kerlin To Ephraim Anderson by deed dated April 6, 1869 and the said Ephraim Anderson having died testate the same lands became vested in Celia Anderson." *Plaintiffs' Exhibit Number 34.*

38. Celia Anderson, who is a remote grantor for all of Plum Hollow's real estate, was the daughter of James Kerlin and the mother of Owen Anderson. *See Plaintiffs' Exhibit Number 9, p. 4 and Plaintiffs' Exhibit Number 12, p. 3.*

10

39. James Kerlin had an unbroken chain of title to real estate designated as Purpart No. 1 and Purpart No. 3 in the partition of the estate of Dennis O'Conner in Bedford County, Pennsylvania, as contained in Bedford County Orphans Court Book 8, page 53. *Plaintiffs' Exhibit Number 17, p. 4.* There are no recorded deeds for these tracts from him during his lifetime and that there was no record that he owned these tracts at the time of his death. The O'Conner partition called for Thomas Stinson, from the JRF grantee chain, as an adjoiner on the north and for Mary Trotter, now George Chestnut, from the JRM chain, as the adjoiner to the east.

40. Dennis O'Conner had an unbroken chain of title back to a patented tract of real estate surveyed in the name of Mary Trotter and to an adjacent patented tract of real estate surveyed in the name of John Trotter and that Purpart No. 1 and Purpart No. 3 in his estate conveyed all his remaining interest in those two tracts lying within what is now Dublin Towship, Fulton County, Pennsylvania. *Plaintiffs' Exhibit 19.*

41. Prior to his death, Dennis O'Conner conveyed 315 acres of the Mary Trotter tract to two (2) of his sons, Bernard and James, in trust for his two (2) grandsons (Dennis of James O'Conner and Dennis of Bernard O'Conner), by deed dated December 28, 1827 (hereinafter "Deed of 1827") as recorded in the Bedford County Deed Book R, page 683. *Plaintiff's Exhibit 18.* There is no record of any other conveyance of lands of Mary Trotter by Dennis O'Conner.

Relating to What and Where the Boundary of the Deed of 1827 is a Matter of Law

42. The Deed of 1827 contains a description using adjoiners, metes and bounds, and quantity. The description for the Deed of 1827 started with the northern

11

boundary, then the eastern boundary, followed by the southern boundary, and finally western boundary. A plot of that description does not close. *Plaintiffs' Exhibit Number 106, p. 1.*

43. The habendum clause in the Deed of 1827 recites inter alia, "To have and to hold the said part of Mary Trotter containing three hundred and fifteen acres of land . . ." *Plaintiffs' Exhibit 106, p. 1.* The plot includes only 194.4018 acres. This is part of the tract situated on the eastern side of Clear Ridge, Dublin Township, Bedford County.

44. The description in the McDowell Mortgage, the oldest record in JMF's chain bears distinct similarities in its courses and distances to the Deed of 1827 from Dennis O'Conner, so that JMF's boundary encompasses the portion of the Deed of 1827 along its eastern boundary which had conveyed a total of 315 acres of the Mary Trotter tract, less the portions in the northwest corner which were occupied by Simpson C. Carmack. *Plaintiffs' Exhibit Numbers 18, 75, 116.*

45. The description in the Deed of 1827 recites, "Beginning at a white oak, thence by land of Elwin Fish South Sixty degrees East three hundred and sixteen perches to a white oak." *Plaintiffs' Exhibit 18.* This length is the same length as the Elwin Fish patent and represents the total division line between the Mary Trotter Warrant and the Elwin Fish Warrant. *Plaintiffs' Exhibit 116, p. 1.*

46. The description of the Deed of 1827 goes outside of the eastern boundary of the Mary Trotter patent but does not end at the land of Robert Lodge which is the purported owner of the junior patent to the south of the Mary Trotter patent. Thus, the eastern boundary of the Deed of 1827 runs the entire length of the eastern boundary of the Mary Trotter patent. *Plaintiffs' Exhibit 116, p. 2.*

12

47.     The northern boundary of Robert Lodge has a bearing of N 56 W, however, the description in the Deed of 1827 does not contain a boundary line with this bearing, but instead contains as its next course, "North twenty five and one half degrees East one hundred and thirty perches to a Chestnut Oak, thence by the residue of Land of Mary Trotter North fifty six degrees West sixty nine perches to a white oak . . . ."

48.     The next course is "North twenty five degrees East sixteen perches to a white oak, thence by land of William Justice dec'd . . . ."

49.     The last three (3) courses in the Deed of 1827 match three of the courses in the Mary Trotter survey calling "along William Justice." The boundary lines that call for William Justice dec'd are N 64 W 36 perches (594 feet) N 15 W 38 perches (627 feet), and N 8 E 110 perches (1815 feet). *Plaintiffs' Exhibit Number 18.*

Relating to the extent of Plum Hollow Hunting Club, Inc.'s Chain of Title

50.     The deed from Anderson to Appleby (hereinafter "Appleby Deed") contains a description that includes monuments, adjoiner, metes and bounds, and quantity. *See Plaintiffs' Exhibit 8, 105.* This description encompasses Clear Ridge Road. The plot of the description in the deed, calculates a quantity of 230.0716 acres as opposed to the quantity stated in the deed as 180 acres, more or less. *Plaintiffs' Exhibit 105, p. 4.* Neither the metes and bounds given for the boundary in common with the Elliot Fleming heirs, from JRF's chain of title, nor the metes and bounds given for the boundary in common with Elijah Baldwin, from JMF's chain of title match.

51.     The recitals in each deed in the chain of title subsequent to the Appleby Deed recite that each grantor conveyed the same land as the grantor had acquired. *Plaintiffs' Exhibits 1-7.*

13

52. Plum Hollow's deed description encompasses all of Purpart No. 1 and the northern portion of Purpart No. 3 from the Estate of Dennis O'Conner (elder) through the Appleby chain. *Plaintiffs' Exhibit 105, p. 11.*

53. At the time of Dennis O'Conner's death, the Orphan's Court portioned all the real estate he still owned from the Mary Trotter patent (hereinafter the "Residue") as well as all real estate he still owned from the John Trotter patent, as part of his estate. *Plaintiffs' Exhibit 17, p. 4.*

54. Purpart No. 1 and Purpart No. 3 comprise all the land that Dennis O'Conner (elder) owned in what is now Dublin Township, Fulton County, Pennsylvania. *Plaintiffs' Exhibit 17, p. 4.*

55. The partition survey does not accurately depict the boundaries of the residue of the Mary Trotter patent as owned by Dennis O'Conner at the time of his death and the partition of his real estate in his Estate. *Plaintiffs' Exhibit 17, p. 4.* On its face, the east-west boundary line on the eastern boundary of the partition breaches the southern boundary of the Mary Trotter patent by 40 perches and is outside the eastern boundary of the John Trotter patent.

56. The partition survey adopted the lines of the Thomas Stinson patent as controlling instead of the lines of the Mary Trotter patent. *Plaintiffs' Exhibits 17, p. 4, 105, p. 12.*

57. Purpart No. 1 contains the entire residue of the Mary Trotter patent, except for a small triangle of uncertain and undefined size at the north eastern corner of Purpart No. 3. *Plaintiffs' Exhibit 17, p. 4.*

14

58.    The Deed of 1865, identified as *Plaintiffs' Exhibit 58*, from JRF's chain of title calls for James Kerlin as at least a southern adjoiner and the deed of 1868 from Foster M. Bergstresser to Elijah Baldwin Jr. in the JMF chain of title calls for James Kerlin as an adjoiner on its western boundary establishing the relative historical boundary position of Plum Hollow as successor to James Kerlin.

59.    The most recent survey for the real estate to which Plum Hollow has record title, the survey of 1969 by Albert Larsen[3] (hereinafter "Survey of 1969") shows JRF's grantor, JMF's predecessor in title, and Henry's predecessor in title as adjoiners, but also locates part of Plum Hollow's southern and eastern boundary with its corner at a stone pile in land outside the boundaries of both the Mary Trotter patent and John Trotter patent to which Plum Hollow has no known evidence of title. *Plaintiffs' Exhibits 121, 125, 130.*

60.    The location of Plum Hollow's real estate through the Appleby Deed is fixed by the location of the Clear Ridge Road on the west, real estate of Plum Hollow through Barnhart as we all Dale Henry on the south, the common boundary of the Mary Trotter patent and the Thomas Stinson patent on the north (as articulated by the Deed of 1865), and the boundary established by the Deed of 1827 on the east and northeast.

61.    The actual eastern boundary is dependent upon the location of the western boundary of JMF.

Relating to the acreage owned by Plum Hollow Hunting Club, Inc.'s from Mary Trotter

62.    The southwestern corner of the Mary Trotter patent, as defined by the plot is bounded on the north by lands of JRF and his grantees as defined by the Deed of 1865, on the east by a line extending from the 16 perch line on the edge of the Horn a distance

---

[3] The survey is identified as Plaintiff's Number 105, p. 2.

15

of 1688 feet, on a bearing of South 25 ½ degrees West; and then on the south by the southern boundary of the Mary Trotter patent a distance of 2951 feet and contains 49.9414 acres. This land is located within Plum Hollow's boundary as part of the Residue.

63. At the time of his death, Dennis O'Conner (elder) of Bedford County owned 152 acres more or less in the southwestern corner of Mary Trotter, being the residue after the conveyance in the Deed of 1827. *Plaintiffs' Exhibit 18.*

64. The partition in the Estate of Dennis O'Conner (elder) of Bedford County failed to account for or adequately describe the residue he owned within the Mary Trotter patent by metes and bounds. *Plaintiffs' Exhibit 17, p. 4.*

### Relating to Douglas Henry's Title

65. The record title for Douglas Henry (hereinafter "Henry") is for a parcel of land (hereinafter "Henry Parcel") first described in a deed from Collins M. Shade and Julia A. Shade, his wife, dated November 13, 1970, and was part of a larger tract of land (hereinafter "Shade Tract"). *Plaintiffs' Exhibit 44.*

66. The description for the Shade Tract can be traced through Lovada Kerlin to a deed (hereinafter "Myers Deed"), dated October 2, 1903, from George W. Myers and Jennie Myers, his wife, to A.G. Kerlin. *Plaintiffs' Exhibit 48.*

67. The Myers Deed recites, "[c]ontaining twenty nine acres and seventy three perches (29 A 73 P) and allowances. This being a part of a tract of land conveyed by deed to Benjamin F. Myers and Barbara Myers by Mary A. Carmack the thirteenth day of Dec A D 1871 and properly acknowledged before James Fields, a Justice of the Peace and conveyed to George W. Myers party hereto by the last will and testament of his

16

mother Mrs. Barbara J. Myers by deed dated May 25, A.D. 1880 and recorded in McConnellsburg Pa. in the deed book then from George W. Myers and Jennie Myers his wife as shown by this deed." *Plaintiffs' Exhibit 48.*

68.    The original description of the Myers Tract is established in the aforesaid will of Barbara J. Myers, as found in Fulton County Will Book 2, page 58 that recites inter alia, "[f]irst I bequeath to my son George W. Myers Twenty-nine and 1/3 acres of land off of the South end of my farm commencing at a point on the line between me and Thomas E. Fleming and running back to the line between me and Elijah Baldwin so as to include the Buildings [sic] on my farm." *Plaintiffs' Exhibit 49.*

69.    The Mary A. Carmack listed in Paragraph 65 was the widow of Simpson B. Carmack also known as S.B. Carmack. *Plaintiffs' Exhibit 50.*

<u>Relating to the Extent of Douglas Henry's Title</u>

70.    As part of the real estate formerly occupied by Simpson B. Carmack, also known as S.B. Carmack, the southern boundary of this tract would lie along either the Fleming Tract, as defined in paragraph 72 below, or the Appleby Tract. The Deed of 1865 in the JRF grantee chain through Fleming specifically calls for Simpson B. Carmack as an adjoiner.

71.    The Shade Tract was subdivided into two adjoining parcels based on an unrecorded survey by Albert M. Larsen (hereinafter "Survey of 1965") on November 2, 1965. The courses and distances in this survey do not match the legal description of the Myers Deed. *Plaintiffs' Exhibit 117, p. 2.*

72.    The Survey of 1965, calls for "Fleming Land" which is in the JRF grantees' chain of title, but does not call for owners of the Appleby Tract as an adjoiner

17

of Shade. The Survey of 1969, identified as *Plaintiffs' Exhibit Number 105, p. 2*, shows Shade as an adjoiner of the Appleby Tract. The same surveyor, Albert Larsen P.E., performed or supervised both surveys.

73.     Collins M. Shade and Julia A. Shade, his wife, conveyed a specific parcel of land (hereinafter "Cecil Fraker Parcel") as shown on the Survey of 1965, by deed to Cecil Fraker dated November 13, 1965. *Plaintiffs' Exhibit Number 117, p. 2.*

74.     Cecil Fraker subsequently subdivided his parcel into two parcels and used the Plum Hollow Road as the common boundary. By a regular chain of conveyances, the parcel north of the Plum Hollow Road, which was first conveyed to Angelo Kaleyias which is now owned by Lonnie D. Henry. The parcel south of the road was retained and is now included in lands of JMF as the last of the four chains identified in Paragraph 93.

75.     The northwest corner, labeled incorrectly as northeast, of Mary Trotter contained 53.4468 (53.45) acres. *Plaintiffs' Exhibit Number 120, p. 3.* John Holland owned 11.6057 (11.60) acres as calculated in the plot of his deed, identified as *Plaintiffs' Exhibit 117*, and the rest was owned by Simpson B. Carmack, also known as S.B. Carmack.

76.     The description in the Baldwin Deed excluded the northwest (labeled incorrectly on the plot as northeast) corner of Mary Trotter that contains 53.4468 acres. *Plaintiffs' Exhibit 120, p. 3.*

77.     The earliest record of ownership of the JMF Chain, namely the mortgage from John S. McDowell to John James, dated October 2, 1865 (hereinafter "McDowell Mortgage") contains a metes and bounds description and recites, "containing between two and three hundred acres be the same more or less excepting the tract or part of a tract

18

conveyed by Geo. Chestnut & wife to Thos. Huston, now in the possession of Simpson B. Carmak containing about fifty acres." *Plaintiffs' Exhibit Number 75.*

78.     The fifty (50) acre reservation to Simpson B. Carmack, as denoted *supra,* is in addition to the real estate already possessed by S.B. Carmack in the Northwest corner, giving Carmack and his grantees approximately 103.45 acres in the Northwest corner of Mary Trotter outside the scope of the McDowell Mortgage metes and bounds description.

79     The precise boundary between Plum Hollow and Henry has never been and cannot be defined through the existing descriptions, monuments or adjoiners.

80.     The call in Mary Trotter is for 34 perches; the call of Thomas Stinson is for 41 perches and Larsen extends the call of Shade to 60 perches.

81.     To the extent that the there is a gap between the lands of the Dennis O'Conner's partitioned real estate and the Mary Trotter patent boundary confirmed by the Deed of 1865 which conveyed the lands of Thomas Stinson, Henry owns all lands not owned by Plum Hollow.

### Relating to J. Ronald Fraker and his Grantees' Title

82.     The description of the real estate, and the plot thereof with adjoiners listed, for which J. Ronald Fraker (hereinafter "JRF") held record title, and subsequently which he later conveyed to his grantees, is first described as a result of an unrecorded survey made in 1976 (hereinafter "Survey of 1976") after the real property of Zelpha G. Fleming, deceased, was sold at public sale by her estate (hereinafter "Fleming Tract"). *Plaintiffs' Exhibit Number 52.*

19

83. All conveyances with the Zelpha G. Fleming chain of title back to the deed from Robert J. Fleming, Executor of Thomas E. Fleming, dated January 13, 1912, recite that they were conveying the same tract of land as the prior deed and used a description by adjoiners only, and called the tract the "old mansion farm". *Plaintiffs' Exhibit Numbers 52-55.*

84. Thomas E. Fleming acquired his title by will of Thomas Welker, also known as Thomas Walker as found in Fulton County Will Book 1, page 457 and recites inter alia, "Item i. Bequeath unto my beloved friend Thomas E. Fleming the mansion property that I now live on to have and hold it and to be his own property." *Plaintiffs' Exhibit 56.*

85. By deed dated December 16, 1865, as found in Fulton County Deed Book 4, page 506 (hereinafter "Deed of 1865"), Ephraim Ramsey conveyed all that tract or parcel of land situate in Dublin Township, County of Fulton, Pennsylvania to Thomas Walker. A plot of the Deed of 1865 with the designated adjoiners represents the shape/configuration of the description in the deed. *Plaintiffs' Exhibit 58.*

86. Ephraim Ramsey obtained his tract from the real estate patented in the name of Thomas Stinson. The warrant issued to Thomas Stinson on September 12, 1839 was for 155 acres of land adjoining lands of John Holland on the North, Dennis O'Conner Jr. on the west, Dennis O'Conner Sr. on the South, and the heirs of Patrick Coulter on the East in Dublin Township, Bedford County. Plaintiff's Exhibit Number 66. The survey for the "Thomas Stinson warrant" was completed by Michael Reed, Deputy Surveyor, Bedford County on November 21 & 22, 1839. The Draft of Survey appears in the Pennsylvania State Archives, Copied Survey Book C205, page 226 as containing 168

20

acres and 138 perches with percent allowance for roads. *Plaintiffs' Exhibit 65*. The "Thomas Stinson Warrant" was patented by Thomas Stinson on January 13, 1845. A copy of the patent appears in Pennsylvania State Archives Patent Book H45, page 285. *Plaintiffs' Exhibit 64*.

### Relating to the extent of J. Ronald Fraker's Title

87. The Survey of 1976 upon which the boundary claimed by JRF and his grantees is based does not use the monuments from the Survey of 1969 which is used to describe the real estate of Plum Hollow. Likewise, Plum Hollow's deed descriptions have never used the monuments from the Survey 1976. The Survey of 1976 does not conform to the description of the real estate set forth in the Deed of 1865.

88. The adjoiners in the Fleming Deed are consistent with the actual adjoiners. A plot of the Survey of 1976 with the designated adjoiners represents the shape/configuration of the description for the survey. *Plaintiffs' Exhibit 108*.

89. Defendants failed to show how the record title held by Zelpha G. Fleming at the time of her death produced the description established by the Survey of 1976.

90. The common source of title between JRF grantees and Plaintiffs is the Commonwealth of Pennsylvania and the title for the JRF grantees can be traced through the Thomas Stinson patent and Plaintiffs title can be traced through the Mary Trotter patent.

91. The description in the Deed of 1865, was made more than 70 years after the Mary Trotter survey and its eastern boundary conforms to the western boundary of Mary Trotter around the Horn with the exception of a monument being a white oak

21

instead of a dogwood and a bearing of S 64 E instead of S 46 E. *Plaintiffs' Exhibits 127, 133.*

92. There is no record or documentary evidence of record that shows any title to JRF or his grantees to lands that come from the patent of Mary Trotter.

## Relating to Janet M. Fraker's Title

93. The record title for Janet M. Fraker, also known as Janet L. Fraker (hereinafter "JMF") is first described as a result of an unrecorded survey made in 1984 (hereinafter "Survey of 1984") when Kenneth L. Fraker and Cecil F. Fraker divided their jointly owned property. *Plaintiffs' Exhibit 67.*

94. The deed with the description taken from the Survey of 1984 (hereinafter "JMF Deed"), labeled as *Plaintiffs' Exhibit 67*, represents that the source of title comes from four (4) different chains of title more explicitly recited in the deed as "Being a portion of Tract #1 in the Deed from John Jere Baldwin and Margaret L. Baldwin, his wife, to Cecil F. Fraker and Kenneth L. Fraker dated September 12, 1957, recorded in Fulton County Deed Book 64, page 189 (hereinafter "Baldwin Deed"); Being a portion of Tract #1 in the Deed from Lois Stevens, widow, to Kenneth L. Fraker and Cecil F. Fraker dated June 28, 1975, recorded in Fulton County Deed Book 81, page 384 (hereinafter "Stevens Deed"); Being all the same lands conveyed by Mason-Dixon Council, Inc., Boy Scouts of America to Cecil F. Fraker and Kenneth L. Fraker by Deed dated 1978, recorded in Fulton County Deed Book 89, page 218 (hereinafter "Scouts Deed"); and Being a portion of the lands conveyed by Collins M. Shade and Julia A. Shade, his wife, to Cecil Fraker by Deed dated November 13, 1965, recorded in Fulton County Deed

22

Book 71, page 52." The last deed listed is accounted for in Paragraph 72 above as part of Henry's chain.

95. Defendant JMF did not show how the four (4) chains of title cited in the JMF Deed explained in the preceeding paragraph, produced the description established by the Survey of 1984.

96. Neither the chain of title for the Stevens Deed nor the chain of title for the Scouts Deed include lands within the Mary Trotter survey, and are not affected by this litigation. Likewise, the tract of land from Shad is not affected by this litigation, although it does lie within the bounds of the Mary Trotter patent. The only title impacted through this litigation is the Baldwin Deed. *Plaintiffs' Exhibit Number 68.*

97. JMF's record title for the Baldwin Deed can be traced by a regular chain of conveyances back to the deed from John S. McDowell to F.M. Berkstresser dated April 2, 1866. *See Plaintiffs' Exhibit 74.* The deed from McDowell to Berkstresser recites, "containing between two and three hundred acres. There is reserved from this tract, a tract of fifty acres more or less, which was conveyed by Geo. Chestnut and wife to Thomas Huston, now occupied by S.B. Carmack (2 tracts)." S.B. Carmack, who is the remote grantor of Henry, is referred to as Simpson B. Carmack in the McDowell Mortgage as set forth supra. *See Plaintiffs' Exhibits 68-74.*

98. A mortgage from John S. McDowell to John James, dated October 2, 1865[4] (hereinafter "McDowell Mortgage") recites, "containing between two and three hundred acres be [sic] same more or less excepting the tract or part of a tract conveyed by Geo. Chestnut & wife to Thos. Huston, now in the possession of Simpson B. Carmack containing about fifty acres. The whole having been conveyed by Geo. Chestnut & wife

---

[4] Identified as *Plaintiffs' Exhibit 75*

23

to John Cessna Esq. by deed dated 13th Sept. 1859, who by deed dated the 19th of September 1859, conveyed the same to John James, who this day hath conveyed the same to the within named mortgagor, and being part of a survey in the name of Mary Trotter." There is no record of the deed from James to McDowell, the deed from Cessna to James, the deed from Chestnut to Cessna, or a deed from O'Conner to Chestnut. *Plaintiffs' Exhibit 75*.

99. There is no record evidence showing any title into George Chestnut, but the description in the McDowell Mortgage bears striking similarities in its courses and distances to the Deed of 1827 from Dennis O'Conner, so that this title encompasses the portion of the Deed of 1827[5] along its eastern boundary which had conveyed a total of 315 acres of the Mary Trotter tract. *Plaintiffs' Exhibit 116, p. 10*.

100. Dennis O'Conner is the common source of title of JMF as well as Plum Hollow.

Relating to the extent of Janet M. Fraker's Title

101. The deed from Kenneth L. Fraker and Daphne Fraker, husband and wife, and Cecil F. Fraker and JMF, husband and wife to Cecil F. Fraker (now deceased) and JMF, husband and wife, dated September 4, 1984[6] (hereinafter "JMF Deed 2") recites, "Being a portion of Tract #1 in the Deed from John Jere Baldwin and Margaret L. Baldwin, his wife, to Cecil F. Fraker and Kennth L. Fraker." *Plaintiffs' Exhibit 68*. The JMF Deed 2 describes a tract of land adjacent to the JMF Deed with the Plum Hollow Road as a common boundary. *Plaintiffs' Exhibit 116, p. 5*.

---

[5] Identified as *Plaintiffs' Exhibit 18*.
[6] Identified as *Plaintiffs' Exhibit 116, p. 5*.

24

102. The descriptions in the McDowell Mortgage and the Baldwin Deed are identical after adjusting for different units of measurement (i.e. rods versus perches) and the call for a red oak instead of a rock oak.

103. The description in the Baldwin Deed chain remain fixed for more than ninety years, before the Survey of 1984 distorted the configuration produced by the description and substantially increased the number of acres without resolving the issues associated with the ambiguities found in the Deed of 1827.

104. The Survey of 1984, which establishes JMF's record boundary, bears no semblance to the legal description set forth in the deeds of conveyance in JMF's chain of title from John Jere Baldwin or his predecessors, and further, like the record boundary of Plum Hollow, encroaches into land outside the southern boundary of the Mary Trotter patent without any evidence of a grant from anyone other than John Jere Baldwin.

105. Notwithstanding any contrary record boundary, the actual legal boundary of JMF on the west as shown in the JMF Deed 2 is limited to the boundary of the Deed of 1827, less that land in the northwest portion of the Deed of 1827 of approximately 103 acres that became possessed and later owned by Simpson B. Carmack as set forth supra.

106. The northwest boundary of the Baldwin Deed, after accounting for the fifty (50) acre exception in favor of S.B. Carmack, north of the Plum Hollow Road, is fixed by the current boundary between Karen S. Grissinger, et al. and Lonnie D. Henry.

107. JMF owned not more than approximately 212 acres in the eastern portion of the Mary Trotter patent, which is part of the tract acquired in the Baldwin Deed. *Plaintiffs' Exhibit 68.*

## Relating to Adverse Possession of JMF

108. There is no residence on the real estate owned or claimed by JMF which was acquired by her predecessors in the Baldwin Deed. There is no evidence that a residence ever existed on this tract of real estate.

109. The real estate owned or claimed by JMF which was acquired by her predecessors in the Baldwin Deed is not and has never been fenced.

110. The real estate owned or claimed by JMF which was acquired by her predecessors in the Baldwin Deed is woodlands.

111. Until the genesis of this action, there is no evidence of a boundary dispute between JMF or her precessors and Plum Hollow or its predecessors along the common boundary.

112. The common source of title among JMF (Deed of 1827), Plum Hollow (Estate of Dennis O'Conner, the elder), and Henry (Deed of 1827) is Dennis O'Conner (the elder).

## Conclusions of Law and Discussion

### Historical perspectives

The matter before the Court is a boundary dispute and the Court will use boundary dispute principles to resolve this case. See Hermansen, Knud Everett, Boundary Retracement Principles and Procedures for Pennsylvania, (1986) [7], p. 5-2 ("From the surveyor's viewpoint, evidence has two purposes: (1) to help determine the position of the boundary and (2) to explain any ambiguity in the boundary location information or field data. The focus of all the information is to determine the location of the original boundary.") The Plaintiffs concisely state the nature of this case when they write, "this case involves the proper legal title [of] boundaries befuddled by more than a

---

[7] All books cited in the opinion were obtained from the Widener University School of Law library system.

26

century of errors in description and survey." *Plaintiffs' Proposed Finding of Fact and Conclusions of Law, p. 42.* Defendant J.R. Fraker frames the case as simply "that he and his successors in title (Dillman, Ramsey, and Miller) are bona fide purchasers who paid a valuable consideration for the ground specifically described (by bearings, distances, monuments and surveys) within their title deeds of record, after title searches conducted by attorneys, and in reliance upon the property descriptions specifically set forth within the Fulton County deed records for some sixty (60) years and more." *J.R. Fraker's Proposed Findings of Fact and Conclusions of Law, p. 3.*

Prior to getting into the specifics of the case, it is important to understand the evolution of boundary dispute law from the beginning. On March 4, 1681, William Penn was granted 47,000,000 acres by King Charles II in satisfaction a 16,000 pound debt owed to Penn's father, Admiral Penn. Nicholson, Vincent D., <u>A Treatise on the Law Relating to Real Estate in Pennsylvania</u> (1929), p. 4. Following the grant, Penn began to sell the land to settlers. Hermansen, p. 3-1. To effectuate the land transfers, Penn established the Land Office. <u>Id.</u>

Under the Divesting Act of 1779 title to the 47,000,000 acres was transferred from William Penn's heirs to the Commonwealth of Pennsylvania in exchange for 130,000 pounds. Nicholson, p. 5, 10; <u>See also</u> Hermansen, p. 3-2. The Divesting Act was passed because following the Revolutionary War "it was considered incompatible with the democratic institutions of the new country for such vast real estate holdings to remain in the Penn family." Nicholson, p. 10.

On April 3rd, 1792, the legislature passed an Act ("1792 Act") which sold those remaining lands owned by the Commonwealth of Pennsylvania. <u>Commonwealth v.</u>

27

Coxe, 4 U.S. 170 (Pa. 1800). The purpose of the 1792 Act was to encourage settlement of rural areas and to fend off hostilities from Native American tribes who, being a threat to the land owners, were also deemed a threat to the development and cultivation of rural lands. Coxe, 4 U.S. at 196, 199. To accomplish this purpose, the proceeds from the warrant were used to pay for the military to fend off the Native Americans. Id. at 199. The Act further provided that the land purchaser, with limited exceptions, was required to make improvement to the land within two (2) years from the date of the warrant. Id. at 196.

In Coxe, the Pennsylvania Supreme Court explained the process of the 1792 Act. First the land was surveyed, and then, in exchange for paying money to the Commonwealth and the submission of an appropriate survey, a land purchaser was issued a warrant by the land office. Id. at 199, 196. The warrant was considered to be a "sales agreement between the proprietors or the Commonwealth on one hand and the citizen (applicant) on the other. It also served as an order or authorization for the deputy surveyor to perform a survey on behalf of the applicant (warrantee)." Hermansen, 3-9 (citing Tryon v. Munson, 77 Pa. 250 (1874)).

At the county level, a "public and official record" was made of all of the submitted surveys. Reilly v. Mountain Coal Co., 54 A. 29, 30 (Pa. 1903). The role of the land office was merely to act as the local agent for the Commonwealth because the land was owned by the Commonwealth. Kelly v. Graham, 9 Watts 116, 117 (Pa. 1839) ("The officers of the land office are not the proprietors of the lands granted by them, that they can grant them without regard to quantity or price. The lands belong to the state; and the land officers act only as the agents of the state in disposing of them; and are limited in

28

their action by the authority granted to them in this behalf."). In addition to the land a purchaser obtained via the survey and warrant process, all property owners were given an additional six percent (6%) of land free of charge to allow for the construction of roads in what is commonly referred to as the "incorporeal burden." In re Opening Private Rd. for Benefit of O'Reilly, 5 A.3d 246, 257 (Pa. 2010).

Following the warrant, a patent was issued by the Governor of the Commonwealth. Coxe, 4 U.S. at 196. The patent served as *prima facie* evidence of title to the patent holder and "the patent conveys the full legal title of the state, and is evidence of title, especially against one who relies on possession alone, who shows no title, and whose rights, if any, accrued after the date of the patent." Olewine v. Messmore, 18 A. 495, 495 (Pa. 1889). Stated another way,

> [t]he patent purports to convey the interests of the Commonwealth or the proprietors (grantors) to the applicant or his vendee. The patent is evidence to all other applicants that the land is no longer vacant and no longer part of the public domain. To receive a patent, an applicant was judged by the Commonwealth to have complied with all the requirements for appropriating vacant land. The patent stands as a resolution regarding the previous proceedings and a dissolution of the Commonwealth's interest in the land described by the patent. It bars the Commonwealth from intervening into future proceedings questioning the title. As such, it operates as a quitclaim deed.

Hermansen, 3-15, 3-17.

If the survey, following the distances and calls, was found to contain more land than what was called for in the warrant, the Commonwealth was paid the excess amount of land upon the issuance of the patent. Hagerty v. Mathers, 31 Pa. 348, 355 (1858). However, if the disparity between the survey and the warrant was so great, the Commonwealth had the authority to order a resurvey of the warrant. Id. Case law has held that if the patent contains land not embraced by the survey, the patent must be

considered void. <u>Kelly</u>, 9 Watts at 117. In sum, as concisely stated by Nicholson the process is as follows:

> A warrant was issued calling for a certain amount of land. If the warrant gave the exact location, no further documents were necessary. If the description were lacking or insufficient, a survey was made by a deputy of the Surveyor General's Office. Upon a return of the survey a patent (i.e., a deed) was issued to the purchaser, provided the purchase price had been paid in full. The purchase price theoretically was due when the warrant was issued, but the eagerness of the proprietors to have the colony settled, and the poverty of most of the settlers led to the sale of most of the land on credit. In such cases the warrant gave an equitable title which was confirmed as against all persons excepting the proprietors by seven years actual residence. The prices and the conditions varied greatly. Quit-rents were usually reserved in addition to the purchase price, but discharged by the Divesting Act of 1779, Section 9, except as to the Proprietary Manors. Six per cent of the amount of land purchased was often added on account of roads to be opened later. Most warrants contained a provision that there must be an actual settlement by residence within two years.

Nicholson, p. 8-9.

From the beginning, the first surveys had problems. Many of the deputy surveyors were known to sacrifice precision in exchange for haste in an effort to maintain progress on all of the survey requests. Hermansen, p. 3-5. In addition to speed, the surveyors were hampered by "Indian harassment and battles with nature." Hermansen, p. 3-6. Timothy Witter, who testified on behalf of the Plaintiffs, testified that the surveying methods used in the 18th century had inherent problems because if the surveyor had metal in his pockets or there was metal in the ground this could affect the reading of the compass. Notes of Testimony, May 20, 2011[8], p. 12. Frequently the surveyor did not have a long enough chain to reach end to end so the surveyor and his crew would be required to move the chain, re-read the compass and then extend the line. N.T. May 20, 2011, p. 14. Likewise, Hermansen notes,

---

[8] Hereinafter "N.T. May 20, 2011".

30

[t]he deputy surveyor (or assistant) worked with two or more chain-carriers and axmen. Many times the chain-carriers and axmen were supplied by the applicant requesting the survey. Frequently, they were people from the local neighborhood or drifters passing through the area. Although the tasks performed by the survey crew did not require much survey knowledge, the measurements did require some care and diligence. From prior experience, it was generally proven that poor chain-carriers meant poor surveys. Therefore, deputy surveyors were instructed to choose their chain-carriers carefully from men of good standing. In 1803, the legislature required all chain-carriers to take oaths to ensure that they would perform measurements diligently and carefully. ...
However, it is general knowledge that the work of the early chain-carriers left much to be desired. 'It is a well-known fact that but few of the recorded distances of the early surveys were often found correct, when run between the monuments on the ground.'
Hermansen, 3-7 quoting Pringle v. Rogers, 44 A. 275 (1899)..

As a result of the problematic surveys, this issue has been litigated time and time

again since 1792. As stated in Martz v. Harley, 4 Watts 261, 263 (Pa. 1835)

There is no survey of ordinary size, the lines of which will measure exactly to the corners, or to the places where they once stood; hence every surveyor in tracing old surveys expects to find and does find the length of every line differing more or less from his draft.

Hermansen notes

[b]y the mid-1800s, much of the public domain had been sold to private individuals. At times, small, unappropriated tracts are still uncovered by survey and title search. These tracts, when found, are available for appropriation provided the Department of Forests and Waters (Department of Environmental Resources) waives their first-purchase option.
Today, the Land Records Division, Pennsylvania Historical and Museum Commission (formerly the Land Office) is responsible for maintaining the original records and disposing of vacant land found unclaimed. It has also been delegated the responsibility to make connected drafts of all the original surveys.
Hermansen, p. 3-3, 3-4.

## Modern day jurisprudence

In modern day jurisprudence, the correct method of resolving a land dispute is

through an action to quiet title pursuant to Pa. R.C.P. 1061 et, seq.. In such an action, the

Plaintiff has the burden of proving by a "fair preponderance of the evidence" they have

31

title to the land. Poffenberger v. Goldstein, 776 A.2d 1037, 1021 (Pa. Cmwlth. 2001); See also Commonwealth v. Pennsylvania Game Commission, 565 A.2d 859, 861 (Pa. Commw. 1989). Upon this showing, the Plaintiff is deemed to have title to the land until a better title is shown by an adverse party. Poffenberger, 776 A.2d at 1021. The Court finds that the Plaintiffs have satisfied their burden and the Defendants have not demonstrated they have better title.

Unlike an action to quiet title, in an ejectment action, a plaintiff has the burden to establish "the right to immediate exclusive possession." Doman v. Brogan, 592 A.2d 104, 108 (Pa. Super. 1991); See also Roberts v. Pursley, 700 A.2d 475, 480 (Pa. Super. 1997) ("'Ejectment is a possessory action wherein a plaintiff must prove the right to exclusive possession vis-à-vis proof of paramount title.'") (quoting Sutton v. Miller, 592 A.2d 83, 89 (Pa. Super. 1991)). "It is too clear for argument and too well settled to require the citation of authority that in ejectment the plaintiff must recover upon the strength of his own and not upon the weakness of his adversary's title." Crist v. Boust, 26 Pa. Super. 543, 544 (1904).

The Defendants argue the Plaintiffs have failed to comply with Pa. R.C.P. 1065 "which requires that they describe the lands to which they seek to quiet title." However, the Court concludes that the Plaintiffs have complied with Pa. R.C.P. 1065 because as discussed *infra*, the Plaintiffs, through the testimony of their expert, have sufficiently described the lands to which they seek to quiet title.

### The Deeds do not need to be Reformed

There is a significant amount of dispute as to whether the deeds in question need to be "reformed". Defendant J.R. Fraker's first two arguments, consisting of seventeen

32

(17) pages, and Defendant Janet M. Fraker's fourth, eighth and tenth arguments all relate to this single issue. The Plaintiffs do not dispute the requirements of reformation. More specifically, the Plaintiffs aver, "[r]eformation is an equitable remedy reserved for cases of mutual mistake or fraud where the court re-writes the parties' agreement or deed." *Plaintiffs' Proposed Findings of Fact and Conclusions of Law, p. 43.* On the contrary, the Defendant Janet M. Fraker argues, "Plaintiffs maintain that they do not seek a deed reformation, however, they do seek for the Court to re-draw the boundaries of PHHC's lands. In reality, if the Court were to re-draw any of the boundaries of PHHC's lands as set forth in its deeds, it would constitute a deed reformation." *Proposed Findings of Fact and Conclusions of Law of Defendant Janet M. Fraker, p. 31.* For the foregoing reasons, the Court concludes that what the Plaintiffs demand does not constitute a "reformation".

As a general rule, for a court to allow reformation of a deed, there must be a mutual mistake in the description of the landed intended to be conveyed. See Uniontown Savings & Loan Co. v. Alicia Land Co., 13 A.2d 65, 66 (Pa. 1940) (allowing reformation of a deed when a land company thought it was conveying a parcel described as "lot No. 22" but in fact was conveying "lot No. 21."); Armstrong County Building and Loan Assn of Ford City v. Guffey, 200 A. 160, 163 (Pa. Super. 1938). A unilateral mistake may justify reformation of a deed or mortgage only when the party opposing the reformation had "'such knowledge of the mistake as to justify an inference of fraud or bad faith.'" Regions Mortgage, Inc. v. Muthler, 889 A.2d 39, 42 (Pa. 2005)[9] (quoting Dudash v. Dudash, 460 A.2d 323 (Pa. Super. 1983)).

---

[9] In Regions the court refused to reform a mortgage where the mortgage company unilaterally and mistakenly removed a spouse's name from the mortgage because there was evidence that the mortgagors committed any type of bad faith or fraud. Rather, it was the bank, as the mortgagee who made the mistake.

33

Where a Plaintiff is relying on reformation of the deeds based on the grantee's intention of the quantity of land conveyed, the Plaintiff must demonstrate mutual mistake. Bosler v. Sun Oil Co., 190 A. 718, 719-20 (Pa. 1937); See also Bosler, 190 A. at 721 (Plaintiff "wholly failed to produce clear and positive proof that a mistake on [defendant]'s part existed. Therefore, a case for reformation was not made out."). To establish mistake "'it must clearly appear by the testimony of witnesses who distinctly remember the facts that a mistake was made and that the writing does not express the agreement.'" Bosler, 190 A. at 721 (quoting Graham v. Carnegie Steel Co., 66 A. 103 (Pa. 1907)).

Since 1839, cases have repeatedly held that the survey must match the patent. See Hole v. Rittenhouse, 25 Pa. 491, 497 (Pa. 1855) ("The Commonwealth and her agents and vendees are bound to take notice of a valid survey marked upon the ground and returned into the land office. The parties who attempt to violate the right of property, by making a second and illegal survey, deserve no favorable consideration whatever."); (Kelly, 9 Watts at 117) ("And wherever it happens, from mistake or otherwise, that this is not the case, the patent must be corrected and reformed by the survey, and made to correspond with it as to quantity and boundary."); Hermansen, 5-3 ("For a retracement survey, a 'preponderance' or majority of evidence is required to reestablish a boundary. Given several possible locations for a boundary, the correct location is determined from the weight of evidence, taking into consideration judicial preference."). Courts following Rittenhouse and Kelly have noted,

> '[w]here the return has lain for years in the office undisturbed, without any
> opposing claim or possession, more particularly where the owner has paid the
> public taxes, the presumption is a "violent" one, and so ought always to be left to
> the jury, of the survey being a regular one, though all the marked lines are not, at

34

a distant day, to be found on the ground; and after twenty-one years, by analogy to all presumptions, I would consider it a presumption of law; and, like livery of seisin, it ought to be presumed.'

Ormsby v. Ihmsen, 34 Pa. 462, 470 (1859) (quoting Mock v. Astley, 13 Serg. & Rawle 382 (Pa. 1825)). The Ormsby court noted the difficulty of attempting to find the surveyors original marks and further held "[t]itles would be insecure, indeed, if, after such a period, the absence of visible marks were held sufficient to invalidate a returned survey." Other courts have noted, "[i]n ascertaining the location of a tract the inquiry is not where it should or might have been located, but where it actually was located." Northumberland Coal Company v. Clement, 95 Pa. 126, 137 (1880).

### Presumptive Grant

Both parties rely heavily on Dougherty and argue that both the case and presumptive grant doctrine support their respective positions. In that case Anthony Sharp purportedly owned real estate in Schuylkill County. When Sharp died 1847, the administrator of his estate petitioned the orphans' court to sell the real estate to pay for Sharp's debts. The sale was ordered in 1849 and Mathias Baier purchased the property. Thereafter, for a sixty (60) year period, there remained an unbroken chain of title. More specifically, in 1857 the Dougherty family purchased the property and the property was deeded to different Dougherty family members in an unbroken chain. The evidence demonstrated that the property was a wild uncultivated mountain that the Dougherty family timbered on, installed fences, cultivated rye, made a small clearing, and paid the taxes on the property since at least 1870. However, the dispute arose because it was later determined that no title was shown in Anthony Sharp, the original grantor from which the Dougherty family took title.

35

The Dougherty court held that the missing deed demonstrating how Sharp acquired the property did not preclude Dougherty from asserting title. In ruling the court noted, "'[i]f any principle in the law of Pennsylvania can be regarded as well settled by argument and authority, it is that which affirms that the legal title to uncultivated lands draws to it the possession, and that this possession is to be deemed actual, for all purposes of remedy.'" Dougherty v. Welshans, 81 A. 997, 1000 (Pa. 1911) (quoting Rittenhouse, 25 Pa. at 491). The court then analyzed the foundation of the presumptive grant doctrine and then applied the doctrine to the specific facts to hold

> [i]n the present case the facts all point in one direction, and not a single fact indicates anything to the contrary. Anthony Sharp at the time of his death claimed this land. It was sold for the payment of his debts. Record notice was given that the purchaser at that sale took title from the estate of Sharp who held under claim of title from Kantner by sundry conveyances. That purchase and those holding under him have had the constructive or actual possession since 1849. The Doughereties [sic] have paid the taxes assessed against it for a period of forty years at least. They have exercised dominion over it for more than fifty years. During all these years no one asserted an adverse claim of title under John Kantner, and no one asserts such a claim in the present case. There is a break in the chain of title from Kantner to Anthony Sharp, but from the time his title passed to Mathias Baier to the present, the successors in title have stood upon this ancient title unchallenged by any adverse claimaint. If anyone else ever claimed adverse title under John Kantner, and there is nothing to even remotely indicate that such a claim was ever made, he hauled down his flag and fled the field long ago.

Doughtery, 81 A. at 1001.

In applying the doctrine to the facts of the case the court placed emphasis on the fact that Baier, as the purchaser of the real estate from Sharp was taking title from the original patent in 1795. Id. at 1001. The court also placed emphasis on the fact that an unbroken chain of title existed from the date of the sale in 1849 to the current date of the dispute, 1911, a period of over sixty (60) years. Id. During that time period Baier or

36

Dougherty owned the property unchallenged by any other claimaint. Both Baier and Dougherty were paying taxes on the property.

In the present case, Defendant Janet M. Fraker argues, "[a]ccording to the doctrine of presumptive grant, defendant Janet M. Fraker must be presumed to be the owner of her entire lands." Proposed Findings of Fact and Conclusions of Law of Defendant Janet M. Fraker, p. 29.

## Block Warrants

In a similar vein, the concept of "block warrants" has a strong foundation in Pennsylvania jurisprudence. In Hagerty v. Mathers, 31 Pa. 348, 355 (1858) the Pennsylvania Supreme Court held "where surveys were made and returned into the land office in blocks, they are to be located on the ground in blocks. If, then, any of them are found to interfere with tracts belonging to the older blocks, the younger gives way to the elder." In the case, a block of warrants were obtained in 1784 (hereinafter "the 1784 warrants"). However, the 1784 warrants were not recorded properly. In 1793 another block of thirteen (13) warrants were obtained (hereinafter "the 1793 warrants"). Again however, the 1793 warrants were never properly recorded. In 1794 two (2) warrants, the warrants in question in the case, were obtained by Mary Niel and Thomas Maston (hereinafter "the 1794 warrants"). In locating the 1794 warrants, the 1794 warrants relied on the 1784 and 1793 warrants, which, as previously mentioned, were never properly recorded. The Court was able to conclude purely on "conjecture" that the distances between the 1784 and 1793 warrants were too far for the 1794 warrant to fit in between unless the 1794 official distances and calls "were greatly overrun." The Court, in reversing the lower court, held that the 1794 warrant must be used as the starting point

37

for the 1784 and 1793 surveys because the 1794 survey was patented and "her lines and quantity are fixed, finally and for ever, as between her owner and the Commonwealth." Id. at 357.

Cases since Hagerty have followed the concept of block warrants and the concept remains cogent today. See Pruner v. Brisbin, 98 Pa. 202, 210 (1881) (Finding no error in the instruction of the trial court "that the thirteen tracts having been surveyed in a block, and so returned, must be located upon the ground as a block; that neither of them can be arbitrarily located in disregard of the lines and corners found upon other parts of the block."); Northumberland Coal, 95 Pa. at 137 ('When original surveys have been made and returned as a block into the land office, the location of each tract therein may be proved by proving the location of the block. . . .Every mark on the ground tending to show the location of any tract in the block is some evidence of the location of the whole block, and therefore of each tract therein"); 6 P.L.E. BOUNDARIES § 15 ("When boundaries in the grants from a common grantor conflict, the grant first executed is controlling, and where the lines of senior and junior surveys conflict, the lines of the senior survey will control.").

In the present case, this dispute began when Plum Hollow was in negotiations to acquire additional property from Gene Barnhart. N.T. May 18, 2011, p. 25. Allen Henry testified, "Mr. Barnhart thought he owned 120 acres. That's what his deed said, that it was 120 acres. He wanted to keep 20 acres which meant the club would be able to purchase approximately 90 acres or 90 plus acres . . ." N.T. May 18, 2011, p. 27. However, upon closer inspection, Doug Henry realized that Barnhart's deed description did not close. N.T. May 18, 2011, p. 27. Allen Henry did some more investigation and

38

concluded that Barnhart had only ninety-three (93) acres. As a result Allen Henry testified that this fact "got me thinking about how can someone not have the acreage to find their deed, and in my investigation to make a long story short, it took me the next four or five years, I eventually concluded that there is, in fact, land that is in this area of Plum Hollow that currently remains titled in the Commonwealth of Pennsylvania...." N.T. May 18, 2011, p. 27. Allen Henry's testimony about his research and the tracing of title back to the Mary Trotter warrant consists of, with limited objections from the parties, 205 pages of testimony[10].

From the beginning of this opinion, the Court has stated that this case is a boundary dispute case. The Court is not re-writing any deeds. The Court, using principles of deed construction, is merely construing what the deeds intended to convey. Since all of the lands now in dispute are derived from the John Trotter warrant, the Elwin Fish warrant or Mary Trotter warrant and all of the warrants were returned on March 1, 1794, the warrants must be considered as a block. See Plaintiff's Exhibits 23, 42, 100. Additionally, all of the warrants were for 400 acres. Id. Since the surveys are considered a block, all of the deeds now in question, as junior surveys, must give way to the senior surveys of the John Trotter, Elwin Fish and Mary Trotter warrants. Accordingly, since the Mary Trotter warrant is incorrect, a fact no one disputes, the Mary Trotter warrant must be corrected[11] to reflect the correct block. Kelly, 9 Watts at 116.

The Court therefore concludes that correcting Mary Trotter warrant is proper. Accordingly, the Court corrects Mary Trotter warrant so that final boundary line is

---

[10] Pages 24 through 182 on the first day of trial, and pages 5 through 52 on the second day of trial. This does not include cross examination.
[11] The Court uses the terms "reformation" or "correction" with a tremendous amount of trepidation. The definition as used in this opinion is simply interpreting what the parties thought they were obtaining had a thorough title search been performed.

39

changed from South 56 West to North 56 West. This change allows the Mary Trotter warrant to close such that the Mary Trotter tract is now adjacent to the John Trotter warrant. Secondly, the Court will change the course from North 46 West to North 64 West. This change allows the plot of the patent to match the survey exactly. Plaintiff's Exhibits 146, 147. Finally, the Court will add an additional 25.77 perches to the eastern boundary so that the boundary closes[12]. Once the Court makes these changes, the Mary Trotter warrant is left with approximately 467.6 acres.

Plaintiffs' have satisfied their
burden of locating the
Mary Trotter Patent

Once the Court makes the changes discussed above the question becomes rather rudimentary—where is the Mary Trotter Patent located with respect to the property owned by the litigants now? "The question of what is a boundary line is a matter of law, but where a boundary line, or corner, is actually located is a question for the trier of fact." Murrer v. American Oil Co., 359 A.2d 817, 819 (Pa. Super. 1976); See also Doman v. Brogan, 592 A.2d 104, (Pa. Super. 1964). "The object of a description in a deed is to identify the land conveyed, and need not necessarily be technically accurate, but must be sufficiently precise for the purpose of identification and to enable a surveyor to locate it." Marks v. Ligonier Borough, 82 A. 477, 479 (Pa. Super. 1912).

In Roth v. Halberstadt, 392 A.2d 855, 857 (Pa. Super. 1978) the court stated, "[t]he primary function of a court faced with a boundary dispute is to ascertain and effectuate the intent of the parties at the time of the original subdivision." See also Pencil

---

[13] The Court notes that this was used in the past. See Fugate v. Coxe, 4 Serg. & Rawle 293, 294 ("It has been usual for surveyors not to make an actual running of the closing line; they leave that open in order to enable them to correct the survey, if necessary, when they have calculated the quantity of land included in the lines; they then close the survey on paper, and sometimes shorten or lengthen one of the lines in order to make the quantity correspond with the warrant. This practice is very convenient and has been sanctioned by long usage."

v. Buchart, 551 A.2d 302, 305-06 (Pa. Super. 1988) ("Initially, we note that the primary function of the trial court resolving a boundary dispute is to ascertain the intent of the grantor at the time of the original subdivision."); Appeals of Dallas, 82 A.2d 676, 679 (Pa. Super. 1951); (The object of the interpretation rules is to "ascertain the actual location of the boundary as made at the time."). "The question of what is a boundary line is a matter of law, but where a boundary line, or corner, is actually located is a question for the trier of fact." Murrer, 359 A.2d at 819; See also Schimp v. Allaman, 659 A.2d 1032, 1034 (Pa. Super. 1995).

Pennsylvania courts have repeatedly utilized the same general rules in interpreting deeds. Notably, "'where there is a conflict between courses and distances or quantity of land and natural or artificial monuments, the monuments prevail.'" Doman, 592 A.2d at 110 (quoting Roth, 392 A.2d at 857); See also Merlino v. Eannotti et ux., 110 A.2d 783, 787 (Pa. Super. 1955). If a beginning corner is known, "the calls ought not to be reversed except in order to make the survey close." Merlino, 110 A.2d at 787. Additionally, "[e]vidence of the acreage of land, especially where . . . the number of acres is followed by the words 'more or less' has little weight against specific boundaries and is in its nature an uncertain method of description and often a mere estimate." Dawson v. Coulter, 106 A. 187, 188 (Pa. 1919). However, if there is a mistake in the description, "'the call adopted as the controlling one should be that most consistent with the apparent intention of the grantor.'" Murrer, 359 A.2d at 820 (quoting Baker v. Roslyn Swim Club, 213 A.2d 145, 149 (Pa. Super. 1965)). Generally, if a map is referred to in a grant or conveyance, the map is deemed to be incorporated into the instrument and therefore

41

"given considerable weight" in determining the true description of the land. <u>Appeals of</u> <u>Dallas</u>, 82 A.2d at 680.

Additionally, "the nature and quantity of the interest conveyed must be ascertained from the instrument itself and cannot be orally shown in the absence of fraud, accident or mistake and we seek to ascertain not what the parties may have intended by the language but what is the meaning of the words." <u>Yuscavage v. Hamlin</u>, 137 A.2d 242, 244 (Pa. 1958). Second, "effect must be given to *all* language of the instrument and no part shall be rejected if it can be given a meaning." <u>Id.</u> (emphasis <u>supplied</u>). Lastly, "the language of the deed shall be interpreted in the light of the subject matter, the apparent object or purpose of the parties and the conditions existing when it was executed."

The description of the property by courses and distances controls over the quantity of land. <u>Bosler v. Sun Oil Co.</u>, 190 A. 718, 719 (Pa. 1937); <u>See also Deppen v.</u> <u>Bogar</u>, 7 Pa. Super. 434, 445 (1898) ("'Quantity is a circumstance of slight, often of no, weight in a question of title, but it may have a marked effect where the question is one of boundary. If there be two lines, one corresponding with the quantity of land in the deed, and the other largely in excess the interference would have weight in determining the true line, especially when strongly assisted by other evidence.'" (quoting <u>Kennedy v. Lubold</u>, 88 Pa. 246, 247 (1879)); <u>See also</u> 6 P.L.E. § 14 (A "statement inserted in a conveyance, of the quantity of land supposed to be conveyed must yield to courses and distances

especially where the reference to quantity of land is qualified by the words 'more or less.'"[13]).

However, where the property description cannot close based on the courses and descriptions found in the property deed, a description of the quantity of area will control. See 6 P.L.E. Boundaries § 14 ("where it is impossible to close a survey by courses and distances, however, and where no lines are found actually marked out, a description by referred to a stated area as the southern end and remaining part of a certain tract will control."). In Duncan v. Madara, 106 Pa. 562 (1884) the Pennsylvania Supreme Court held that using the total size of the lot was proper where a deed for property did not properly close on the northern edge even though the parties knew the location of the southern edge of the property.

### Location of Mary Trotter

The Court finds the Plaintiffs have sufficiently demonstrated the location of the Mary Trotter warrant, through the credible testimony of Timothy Witter and Allen Henry. Mr. Witter has been a licensed professional surveyor since 1985, has testified before in court proceedings on numerous occasions and, in this Court's opinion, impressive credentials. Notes of Testimony, May 19, 2011, p. 129. He graduated from Penn State University in 1978 with an associate's degree in land surveying and has been surveying "all kinds of property surveys, subdivisions for land developments, topographic surveys"

---

[13] The writer notes that Defendant J. Ronald Fraker's expert, Thomas M. Englerth, explained these general principles as he was describing what he typically does when trying to locate a survey. More specifically, Englerth testified

Well, first and foremost is trying to find monumentation, and then the second I would think would does the monumentation fit or come close to fitting any deed calls that you may have. And then after that, you find other things that will lend credence to the location of the lines.

For example, blaze lines running between two found monuments. You may find fence lines. You may find stone rows and you may find people have posted the ground.

Notes of Testimony, July 26, 2011, p. 15-16.

43

ever since. Id. Mr. Witter's testimony about the location of the Mary Trotter warrant consists of 80 pages[14] of transcript and relies on countless exhibits. The Defendants have presented no evidence to contradict, discredit, or otherwise question the Plaintiffs' evidence.

The Court further finds that Plum Hollow has sufficiently demonstrated its chain of title back through the Mary Trotter Patent. The testimony from Allen Henry detailing the chain of title from the Mary Trotter Patent through the present day was extensive and credible. Additionally, the Plaintiffs introduced 148 exhibits in support of their position. At the outset of the trial, the Defendants stipulated to the authenticity of all exhibits introduced. N.T. May 18, 2011, p. 7. The Defendants have done nothing to rebut this position.

The Court recognizes that the testimony of Allen Henry is biased because his brother, Plaintiff Douglas Henry, another brother and four (4) sisters have title to the property now in dispute. N.T. May 18, 2011, p. 19. Allen Henry has also had a relationship with Plaintiff Plum Hollow since the late 1970s. N.T. May 18, 2011, p. 20. Again however, the Defendants have done nothing to rebut the accuracy of Allen Henry's testimony. Accordingly, this Court must accept Allen Henry's testimony and research as credible and accurate.

The evidence demonstrates that Tract No. 2(a) in the Henry Deed can be traced by an unbroken, regular chain of conveyances to a deed, dated February 26, 1869, from Ephraim Ramsey to William Peters that contained a description taken from a survey and associated draft that established the northeastern corner of the Thomas Stinson Patent. See *Plaintiffs' Exhibits 97, 60.* Tract No. 2(b) in the Henry Deed can be traced by an

---

[14] Notes of Testimony May 19, 2011, p. 131-169 and Notes of Testimony May 20, 2011, p. 4-46

44

unbroken, regular chain of conveyances to a deed, dated December 17, 1862, from Robert Ramsey and Wife, to Jacob Wible that describes, based upon a survey and associated draft, a parcel of land that lies within and forms the southwestern corner of the Elwin Fish patent. See *Plaintiffs' Exhibits 97*.

Tract No. 3 in the Henry Deed can be traced by an unbroken, regular chain of conveyances to a deed, dated September 12, 1867, from John Hollard Sr. and his wife to George W. Hollard to a tract of land (hereinafter "Holland Tract"), that established the northwestern corner of the Mary Trotter patent, and the western boundary of the Holland Tract is part of the western boundary of the Mary Trotter patent. *Plaintiffs' Exhibit 98*. The Holland Deed contains the accurate description of Tract No. 3 in the Henry Deed, *Plaintiffs' Exhibit 117, p. 1*.

Next, Tract No. 1 of the Henry Deed as reflected on *Plaintiffs' Exhibit No. 123* to Timothy C. Witter's testimony shows this tract as the southeastern corner of the Charles Sewell Tract and the final corner needed to establish the Four Corners. By locating the Four Corners, the Mary Trotter patent can be anchored to the Elwin Fish patent and its location determined.

The location of the Mary Trotter patent by determining Four Corners at the northwestern corner of the Mary Trotter patent is confirmed by the work that was done to the south where Timothy Witter's survey work allowed it to establish the southern line of the John Trotter patent as depicted in *Plaintiffs' Exhibit 125*. Since the John Trotter patent is senior and part of a block with the Mary Trotter patent its location is paramount and the location of the southern line fixes the location of the Mary Trotter patent with greater precision as this line is fixed by the adjoiner of Patrick Neeley to the south.

45

Further confirmation of the location of the Mary Trotter arises from finding a planted stone on the Elwin Fish western boundary at a corner in common with Charles Sewell and James Justice which is a recognized monument of that corner. *Plaintiffs' Exhibit 122.* This planted stone helps pinpoint the Elwin Fish patent location and narrows the parameters for the Mary Trotter patent location.

Looking at the evidence peculiar to the Mary Trotter patent confirms the location. A corner in common with defendant Bonnie Miller, Henry, and defendant Dulce Burger Hall (Hereinafter "Henry-Hall-Miller-Corner") is a corner that is also a Mary Trotter corner. The corner is identified as point "A" in the Survey of 1965. The corner was identified as an iron pin in the Survey of 1976, a "white oak stump (gone)" in the Henry deed as well as a "w.o. stump (gone)" in the Survey of 1965. This suggests that the corner was never properly surveyed and marked by monument.

Another corner in common with Henry, and defendant Dulce Burger Hall (hereinafter "Henry-Hall-Corner #1.") is also a Mary Trotter corner. The corner is identified as point "B" in the Survey of 1965. The corner is shown as a twenty-two (22) inch white oak in *Plaintiffs' Exhibit 123.* The corner was identified as a twenty-four (24) inch oak in the Survey of 1976, as agreed to by Henry and J. Ronald Fraker based on Henry's uncontradicted testimony. The Henry deed calls it a white oak and it is marked "w.o." in the Survey of 1965. This suggests that this corner also has never been properly surveyed and marked by monument.

A second corner in common with Henry and defendant Dulce Burger Hall (hereinafter "Henry-Hall-Corner #2") is a corner shared by Henry and Hall, located on the Fleming/Trotter line as first mentioned in the Will of Barbara Myers. The corner is

46

identified as point "C" in the Survey of 1965. The corner is identified as "Existing Post in Stones" in JRF Exhibit A-1. The Survey of 1976 and the Henry deed call for a stone as a monument, and a "stake in stones" on Plaintiffs' Exhibit 123. The Survey of 1965 calls for a "w.o.", suggesting that the corner has never been properly survey and arced with monuments.

The boundary line that connects the Henry-Hall-Miller-Corner and the Henry-Hall-Corner #1 was identified as line "AB" on the Survey of 1965 but was not retraced. It is not identified in J.R. Fraker Exhibit A-1. Plaintiffs' expert failed to retrace the line but identified it as line "P6" (hereinafter "P6 line") in his testimony and on his Exhibits.

The boundary line that connects the Henry-Hall-Corner #1 and the Henry-Hall-Corner #2 was identified as line "BC" in the Survey of 1965 and it too was never retraced. That line was not identified in JRF Exhibit A-1; it was retraced by Plaintiffs' expert and is an area where he found remnants of the fence as discussed below.

The course in the Mary Trotter patent is "N 8 E 110 perches" and consists of the following four (4) segments on Plaintiffs' Exhibit No. 123: Henry-Hall-Corner #1 to Henry-Hall-Corner #2; Henry-Hall-Corner #2 to Hall-Holland-Corner, which is the boundary line between the two tracts currently owned by defendant Dulce Burger Hall; Hall-Holland-Corner to the Plum Hollow Road, whom Plaintiffs' expert identified as the two acre out sale from the Fleming Tract owned by Twila M. Long; and the Plum Hollow Road to the Four Corners, currently on the Henry Farm.

In addition to the evidence from the location of the adjoiners and use lines, Timothy C. Witter also documented physical evidence of fence remnants in the area he identified as the Mary Trotter patent boundary. Although this is not conclusive, it

47

supports his overall conclusion as to the location of the boundary. Mr. Witter testified that the N 64 W / S 64 E line identified on Plaintiffs' Exhibit No. 124 as line "P5" places the remaining courses of the Mary Trotter patent on the old fence and along the old roadbed on the southern side of the Horn.

### Relating to Plum Hollow Hunting Club, Inc.'s
### Chain of Title to
### the Mary Trotter Patent

Plum Hollow's chain of title back to the Mary Trotter patent is supported by an unbroken chain of title back to Celia Anderson and that chain contains the same basic legal description to the partition in the Estate of Dennis O'Conner (elder) in Bedford County. Plaintiffs sufficiently demonstrated this through the testimony of Allen K. Henry and a plot of the partition. See *Plaintiff's Exhibit 105; N.T. May 18, 2011, p. 158.*

While there is a break in the chain title between James Kerlin and Ephraim Anderson, title was confirmed by this Court, when in 1910, sitting as an Orphan's Court confirmed the deed of conveyance for this land from the Estate of Ephraim Ramsey to Celia Anderson. This confirmation, combined with the recitals in the Anderson Deed, the Appleby Deed and the A.G. Kerlin Deed, give rise to a presumption of grant that confirms that fee simple title of the two tracts owned by James Kerlin, for which there are no recorded deeds, became vested in Owen Anderson. See Dougherty, 81 A. at 1001. There is a second break in the chain of title between Dennis O'Conner (elder) and James Kerlin. Again, however, the Plaintiffs have demonstrated through sufficient circumstantial evidence such that the Plaintiffs are able to properly trace title back to the Mary Trotter patent.

### Location of Deed of 1827

48

In addition to the errors in the Mary Trotter warrant, there are errors in the Deed of 1827 that prevent the Deed from closing. The location of this Deed is critical to the outcome of this case because, except for adverse possession discussed *infra*, Defendant Janet M. Fraker's land is derived entirely from the Deed of 1827. Plum Hollow owns the remaining acreage from the Mary Trotter patent with the Deed of 1827 setting the boundary along the southwestern corner of the Mary Trotter patent that is titled in Plum Hollow.

The known parameters of the Deed of 1827 contain adjoiners, metes and bounds, and quantity, but no natural monuments were ever found. The deed description started with the northern boundary, then the eastern boundary, followed by the southern boundary, and then finally the western boundary with the habendum clause stating that the property contains 315 acres. The eastern boundary must be adjusted because it goes outside the eastern boundary of the Mary Trotter patent, but it does run the entire distance of that eastern boundary to lands of Robert Lodge. The description then continues without creating a southern boundary in common with Robert Lodge, "[n]orth twenty five and one half degrees East one hundred and thirty perches to a Chestnut Oak, thence by the residue of Land of Mary Trotter North fifty six degrees West sixty nine perches to a white oak . . . ." These lines mark the beginning of the common boundary with the Residue, now owned by Plum Hollow. The next course, "[n]orth twenty five degrees East sixteen perches to a white oak" reaches a point described as at lands of William Justice, dec'd, which was the reputed owner of the Thomas Stinson patent at the time of the Mary Trotter survey and patent. The description then continues the last three courses and distances around the northwest boundary of the Mary Trotter patent to the beginning.

49

The errors in the description leave the major determining factor of setting the boundary as the acreage in the tract. The primary function of this Court is to ascertain the intent of the grantor at the time of the original subdivision. See Pencil, 551 A.2d at 306. To ascertain this intent, courts use certain rules of construction—notably "'[e]vidence of the acreage of land, especially where the number of acres is followed by the words 'more or less', has little weight as against specific boundaries and is in its nature an uncertain method of description and often a mere estimate. Where, however, a doubt exists as to the actual location of the boundary and the writing contains no words to definitely fix the line by either metes and bounds or monuments on the ground, evidence of the acreage becomes a material factor in the determination of the intention of the parties.'" Pencil, 551 A.2d at 307 (quoting Dawson v. Coulter, 106 A. 187, 188 (Pa. 1919); See also Jedlicka v. Clemmer, 677 A.2d 1232, 1234 (Pa. Super. 1996). However, courts have repeatedly held that acreage is the only factor which can determine the intention of the parties. Accordingly, the Court will adjust the First Gap along the southern boundary of the Mary Trotter patent to set the southeast corner of the Residue, now owned by Plum Hollow, and determine the location of the 130 perch line to the northeast corner of the Residue when the boundary follows a parallel line to the Mary Trotter patent southern boundary a distance of sixty-nine (69) perches. The final adjustment must be to determine the boundary for the Second Gap to meet the northeastern corner of the Horn. Closing these two gaps will result in the Residue having about 152.6 acres and the outside boundary of the Deed of 1827 having 315 acres. However, the Court takes the Plaintiffs' suggestion and will allow the parties the opportunity to negotiate a line.

The extent and acreage of Plum Hollow Hunting Club, Inc.'s Title

50

Once the Court has determined that Plum Hollow has legal title to the residue of the Mary Trotter patent, the question still remains—what is the extent of Plum Hollow's title? The metes and bounds description in the deeds and surveys in its chain of title do not match the metes and bounds descriptions of its adjoiners. The historical description for its property is rife with error in acreage and consistent courses and distances. The one consistent element of its title has been the consistency of its called adjoiners and the consistency with which its adjoiners have called for the predecessors in title of Plum Hollow as adjoiners.

Since the Appleby Deed, each deed has recited that it conveys the same real estate as its predecessor deed. Despite the repeated inaccuracies, the basic shape of the tract owned by Plum Hollow has been stable since the survey for the partition in the Dennis O'Conner (elder) Estate as well as having adjoiners in the JRF chain of title on the north and the JMF chain of title to the east. The partition survey is defective, but claims to divide and convey all of the land of Dennis O'Conner (elder) that he had at his death in what is now Dublin Township, Fulton County, which includes all the Residue of the Mary Trotter patent. Subsequent errors of description do not diminish Plum Hollow's title or the extent of that title. Likewise, recent surveys cannot replace the ancient boundary lines with modern monuments that do not tie in to the ancient monuments. See Reilly v. Mountain Coal Co., 54 A. 29, 33 (Pa. 1903).

The location of Plum Hollow's real estate through the Appleby Deed is fixed by the location of the Clear Ridge Road on the west, real estate of Plum Hollow through Barnhart as well as Dale Henry on the south, the common boundary of the Mary Trotter

patent and the Thomas Stinson patent on the north and the boundary established by the Deed of 1827 as fixed by this Court on the east and northeast.

This Court has previously ruled that the Thomas Stinson patent is junior to the Mary Patent and therefore must yield. Accordingly, the lines of a junior survey cannot change, alter, or affect a senior one if they come into conflict. See Tyrone Min. and Manuf'g Co. v. Cross, 18 A. 519, 519 (Pa. 1889) ("It is very clear, that in a contest between two adjoining surveys, the junior must always give way. It may have a well-marked line of the proper age for its own survey inclosing, but the senior will not be affected by it."). Accordingly, the line between Plum Hollow, Henry and JRF and his grantees is fixed by the location of the Mary Trotter patent boundary.

Plum Hollow's eastern boundary and the northeastern boundary is dependent upon the placement of the 130 perch line and the resolution of the Second Gap in the Deed of 1827 which prevails as a prior conveyance, but which has never been set because of the latent ambiguities in the Deed of 1827. The boundary of the Deed of 1827 must be set so as to provide 315 acres in the Deed of 1827 and to leave 152.67 acres in the Residue, now owned by Plum Hollow.

**Relating to Douglas Henry's Title and the Extent of that Title**

Henry has legal title to a portion of the property judicially determined to be real estate owned by the widow of Simpson B. Carmack that lies in the northwestern corner of the Mary Trotter patent. His title is traced back through Collins Shade and Lovada Kerlin to Barbara Myers who devised the real estate to her son George Myers when it was a 29 1/3 acre tract described as "off of the South end of my farm commencing at a point on the line between me and Thomas E. Fleming and running back to the line between and Elijah

52

Baldwin. *Plaintiffs' Exhibit No. 49.* Henry owns the residue of land that existed after Collins Shade subdivided the parcel and conveyed the Cecil Fraker Parcel along the northern side of the Plum Hollow Road in the area of the Horn to Cecil Fraker using the Survey of 1965. Plaintiffs' Exhibit 117, p. 2. The adjoiners and description of the real estate as the "residue" of Collin Shade from the Survey of 1965 are made part of Henry's deed. Cecil Fraker subsequently subdivided this into the tract now owned by Lonnie Henry and a smaller tract to the east south of the Plum Hollow Road, now owned by JMF.

Simpson B. Carmack is listed as an adjoiner on the northern side of the Horn in the Deed of 1865 in the JRF grantee chain through Fleming. See *Plaintiffs' Exhibit No. 58.* The Survey of 1965 calls for "Fleming Land" which is in the JRF grantees' chain of title, but does not call for owners of the Appleby Tract as an adjoiner of Shade. See *Plaintiffs' Exhibit No. 117, p. 2.* The survey does not show any adjoiner on the southern boundary. The Survey of 1969 of land now owned by Plum Hollow does show Shade as an adjoiner of the Appleby Tract on the north. See *Plaintiffs' Exhibit No. 105, p. 2.* Thus, the record shows that Henry owns everything once owned by Simpson B. Carmack south of the Plum Hollow Road along the Horn adjacent to JRF and his grantees from the Fleming chain. It appears he might also have a common boundary with Plum Hollow along his southern boundary, but that line has been resolved through other means. The adjoiners control the limits of his boundary, instead of inconsistent metes and bounds calls or surveys. Quinn v. Heart, 43 Pa. 337, 341 (1862) ("Not only is there no such rule as the plaintiff obliged to content for, but on the contrary this court was willing, so long

53

as 1835, to disregard lines actually run on the ground in order to carry a survey to the adjoiners called for.").

The Defendant's expert concluded that Lovada Kerlin owned the Encroachment Area claimed by JRF under the Fleming Deed and Survey of 1976 lying outside the description of the Deed of 1865 which set the true legal boundary for the Fleming Tract and the scope of legal title which the Estate of Zelpha Fleming could convey. Since there is no evidence of any conveyance from the Lovada Kerlin chain into the Fleming chain, Henry, as the owner of the residue of Lovada Kerlin, owns title between the Horn and Plum Hollow Road.

**Relating to J. Ronald Fraker and his Grantees' Title and the extent of that Title**

This Court has previously ruled that both the source of title for JRF and his grantees comes through the Thomas Stinson patent which is described in the Deed of 1865 in conformity with the Mary Trotter patent. Therefore, once the Mary Trotter patent boundary is determined, the lines between the plaintiffs and JRF are determined. Except for the adverse possession and the doctrine of consentable lines, any interference between the Survey of 1976 and the Mary Trotter patent is resolved in favor of those holding title through Mary Trotter.

**Relating to Janet M. Fraker's Title and its Extent**

The dispute between Henry, Plum Hollow and JMF concerns the real estate she still owns within the bounds of the Mary Trotter patent. The Plaintiffs acknowledge that JMF owns any real estate north of Plum Hollow Road. See *Plaintiffs' Proposed Finding of Fact and Conclusions of Law, p. 63*.

54

JMF's real estate is first described as a result of the unrecorded Survey of 1984 and concerns the tract conveyed in the Baldwin Deed. JMF's record title for this tract can be traced by a regular chain of conveyances back to the deed from John S. McDowell to F.M. Berkstresser dated April 2, 1866. This deed is linked to the 1865 McDowell Mortgage which is described as "containing between two and three hundred acres be the same more or less excepting the tract or part of a tract conveyed by Geo. Chestnut & wife to Thos. Huston, now in the possession of Simpson B. Carmack containing about fifty acres. The whole having been conveyed by Geo. Chestnut & wife to John Cessna Esquire by deed dated 13th Sept. 1859, who by deed dated the 19th of September 1859, conveyed the same to John James, who this day hath conveyed the same to the within named mortgagor, and being part of survey in the name of Mary Trotter."

There is no record evidence showing any title into George Chestnut, but the description in the McDowell Mortgage bears striking similarities in its courses and distances to the Deed of 1827 so that this title encompasses the portion of the Deed of 1827 along its eastern boundary and part of its 315 acres. This makes Dennis O'Conner (elder) the common source of title of JMF, Henry, and Plum Hollow. The description for this tract remained the same until the Survey of 1984. Thus, despite a contrary record boundary, the actual legal title of JMF is limited to the boundary of the Deed of 1827, less all that land in the northwest portion of the Deed of 1827 of approximately 103 acres that was occupied and later owned by Simpson B. Carmack a.k.a. S.B. Carmack. This line is the same as the modern boundary between JMF and Lonnie D. Henry. Therefore, JMF's total acreage is 212 acres.

The Court takes the Plaintiffs' suggestion and holds that this is the extent of JMF's legal title. The Court will allow an opportunity for Plum Hollow and JMF to negotiate a mutually agreeable line between the parties.

<u>Defendants are not Bona Fide Purchasers</u>

All Defendants argue they are bona fide purchasers for value because of the breaks in the chain of title to the Plum Hollow, Plaintiffs could have traced their respective deeds back to 1794 and the circumstantial evidence deduced by the Plaintiffs is insufficient. See *Proposed Findings of Fact and Conclusions of Law of Defendant Janet M. Fraker, p. 35; J.R. Fraker's Proposed Findings of Fact and Conclusions of Law, p. 75-84.* The Defendants conclude by arguing "[p]ersons who do not properly record their title deeds or any other interest they claim risk the loss of their property, as any unrecorded interest in land is deemed void as to a BFP without actual notice of any interest claimed outside of those set forth within the property records." *J.R. Fraker's Proposed Findings of Fact and Conclusions of Law, p. 76.* However, the Plaintiffs' argue the BFP argument is irrelevant "[s]ince neither JRF nor his grantees purchased real estate that came from the Mary Trotter chain of title, they cannot claim BFP status as purchasers from that chain." *Plaintiffs' Proposed Finding of Fact and Conclusion of Law, p. 42.*

A bona fide purchaser is defined as "[o]ne who buys something for value without notice of another's claim to the item or of any defects in the seller's title; one who has in good faith paid valuable consideration for property without notice of adverse claims."

56

"purchaser", p. 1249, Black's Law Dictionary, 7th Ed., 1999. The statutory framework

for bona fide purchasers is established in 21 P.S. §§ 351[15] and 444[16].

To be a bona fide purchaser under § 351, a purchaser of real property must

acquire the property without actual or constructive notice of a prior interest in the

property. See also In re Wagner, 353 B.R. 106 (Bkrtcy. W.D. Pa. 2006); Roberts v.

Pursley, 718 A.2d 837, 841 (Pa. Super. 1998) ("In order to qualify as a bona fide

purchaser, the subsequent buyer must be without notice of a prior equitable interest.").

Additionally, a bona fide purchaser must also act in good faith. Poffenberger v.

---

[15] 21 P.S. § 351 entitled, "Failure to record conveyance" provides

    All deeds, conveyances, contracts, and other instruments of writing wherein it shall be the intention of the parties executing the same to grant, bargain, sell, and convey any lands, tenements, or hereditaments situate in this Commonwealth, upon being acknowledged by the parties executing the same or proved in the manner provided by the laws of this Commonwealth, shall be recorded in the office for the recording of deeds in the county where such lands, tenements, and hereditaments are situate. Every such deed, conveyance, contract, or other instrument of writing which shall not be acknowledged or proved and recorded, as aforesaid, shall be adjudged fraudulent and void as to any subsequent bona fide purchaser or mortgagee or holder of any judgment, duly entered in the prothonotary's office of the county in which the lands, tenements, or hereditaments are situate, without actual or constructive notice unless such deed, conveyance, contract, or instrument of writing shall be recorded, as aforesaid, before the recording of the deed or conveyance or the entry of the judgment under which such subsequent purchaser, mortgagee, or judgment creditor shall claim. Nothing contained in this act shall be construed to repeal or modify any law providing for the lien of purchase money mortgages.

[16] Section 444 entitled, "All deeds made in the state to be acknowledged and recorded within ninety days" provides,

    All deeds and conveyances, which, from and after the passage of this act, shall be made and executed within this commonwealth of or concerning any lands, tenements or hereditaments in this commonwealth, or whereby the title to the same may be in any way affected in law or equity, shall be acknowledged by the grantor, or grantors, bargainor or bargainors, or proved by one or more of the subscribing witnesses thereto, before one of the judges of the supreme court, or before one of the judges of the court of common pleas, or recorder of deeds, prothonotary, or clerk of any court of record, justice of the peace, or notary public of the county wherein said conveyed lands lie, and shall be recorded in the office for the recording of deeds where such lands, tenements or hereditaments are lying and being, within ninety days after the execution of such deeds or conveyance, and every such deed and conveyance that shall at any time after the passage of this act be made and executed in this commonwealth, and which shall not be proved and recorded as aforesaid, shall be adjudged fraudulent and void against any subsequent purchaser or mortgagee for a valid consideration, or any creditor of the grantor or bargainor in said deed of conveyance, and all deeds or conveyances that may have been made and executed prior to the passage of this act, having been duly proved and acknowledged as now directed by law, which shall not be recorded in the office for recording of deeds in the county where said lands and tenements and hereditaments are lying and being, within ninety days after the date of the passage of this act, shall be adjudged fraudulent and void as to any subsequent purchaser for a valid consideration, or mortgagee, or creditor of the grantor, or bargainor therein.

57

Goldstein, 776 A.2d 1037, 1042 (Pa. Cmwlth. 2001); See also Carnegie Natural Gas Company v. Braddock, 597 A.2d 285, 287 (Pa. Cmwlth. 1991) ("A bona fide purchaser is defined as one who pays valuable consideration, has no notice of outstanding rights of others, and acts in good faith.").

The statute, which has been in effect since January 1, 1926, reflects the purpose of the recording statutes which is to protect bona fide purchasers and provide the public with notice in whom the title resides. Poffenburger, 776 A.2d at 1042. Once a deed is recorded, subsequent purchasers, mortgagees or creditors are deemed to have constructive notice of the deed. 21 P.S. §357; First National Bank v. Sherwood, 879 A.2d 178, 181 (Pa. 2005). "Equity protects innocent purchasers by providing that a bona fide purchaser for value and without notice has a perfect defense in a suite brought by a holder of a prior equitable claim." MacKubbin v. Rosedale Memorial Park, 257 A.2d 587, 589 (Pa. 1969). The case of Roberts v. Pursley, 718 A.2d 837, (Pa. Super. 1998) is directly on point.

In Roberts, the Superior Court held that a trial court properly applied the bona fide purchaser statutes to conclude that a landowner had legal title because the landowner was a bona fide purchaser even though the landowner's predecessor did not have legal title. In the case, Kehoe[17] owned property that he traced back to 1854 when the "Keating/Willing Warrant", as the original warrant, was completed. Roberts, 718 A.2d at 840. One of the opposing parties, Roberts, was able to trace the chain of title back to the Keating/Willing warrant as well. However, there was an error in the chain of title resulting from a flawed conveyance in 1901. Although the opinion is not clear who

---

[17] The case involved numerous parties and the procedural history in the case was extensive. Kehoe was one of the parties involved in the original action who filed an appeal.

owned the Roberts property between 1901 and 1964, it is clear that in 1964 Milton S. Kelius and Mary Kelius acquired and properly recorded the property. In 1975, the Kelius's transferred the property to Roberts. The trial court, found for Roberts by concluding that while Kehoe was able to trace the property back to 1854, Roberts was able to trace title back to 1901 and that Roberts was unable to demonstrate that his "predecessors ever acquired title to the acreage contained within said Warrant." Roberts, 718 A.2d at 840. The trial court still found for Roberts by writing, "but for the Pennsylvania recording statute, [Kehoe] established their claim to title by a preponderance of the evidence." Roberts, 718 A.2d at 840.

On appeal the Superior Court held "[b]ecause [21 P.S.] sections 351 and 444 are both intended to provide the same protections to bona fide purchasers, and in light of the fact that the sections must be read together, we hold that the trial court was correct in applying the Pennsylvania recording statute to the facts of this case." Kehoe, relying Kaiser Energy Inc. v. Commonwealth of Pennsylvania, Department of Environmental Resources, 535 A.2d 1255 (Pa. Commw. 1998)[18] argued unsuccessfully that "the bona fide purchaser concept does not apply to the facts of the present case because Appellees' grantor did not possess legal title." Roberts, 535 A.2d at 841. In rejecting this argument the Roberts court noted, "we find the Commonwealth Court's argument inconsistent with the bona fide purchaser concept contained within the recording statute of this Commonwealth." The Roberts court therefore concluded, "[i]n order to qualify as a bona fide purchaser, the subsequent buyer must be without notice of a prior equitable interest." The Roberts court reasoned,

---

[18] The Kaiser court held, "'the bona fide purchaser concept applies only to purchasers of legal title.'" Roberts, 718 A.2d at 841 (quoting Kaiser, 535 A.2d at 1258).

59

> If 'legal title,' within [Kehoe's] definition, were required for a subsequent purchaser to qualify as a bona fide purchaser, the recording statute would not further its intended goals. For instance, in the typical recording statute situation, a grantor sells land to a grantee who does not record the deed; then, a subsequent buyer purchases the same land from the same grantor as the original grantee and this subsequent grantee records his deed before the first grantee. The subsequent grantee does not have 'legal title' within [Kehoe's] definition because at the time the land was sold to him, the grantor did not have legal title to give such a right. Yet, notwithstanding the fact that he does not have 'legal title,' he is a bona fide purchaser if at the time of the sale he was without notice of an adverse interest and value was given for a purchase of the land. As evidenced here, imposing a requirement of 'legal title' to the definition of bona purchaser would nearly render the recording statute useless.

Roberts, 718 A.2d at 841 (citations omitted). Given that there are three (3) elements, each element shall be taken in turn.

The first element is valuable consideration. In the present case all parties appear to have purchased their respective properties with good and valuable consideration. Since there appears to be little dispute about this element, this element is satisfied for all parties involved.

The second and third elements, the person must have act in good faith and be without either constructive or actual notice of the defect in title, are interrelated and strike at the heart of this case. Not surprisingly, these elements have been the subject of most of the litigation over the years.

The burden of proving no notice is on the party asserting the unrecorded rights in the property. Carnegie Natural Gas Company v. Braddock, 597 A.2d 285, 287 (Pa. Cmwlth. 1991). Notice may be either actual or constructive. Long John Silvers, Inc. v. Fiore, 386 A.2d 569, 573. (Pa. Super. 1978). Constructive notice of a prior unrecorded agreement may be found where the subsequent purchaser could have learned of the facts that may affect his title by inquiry of persons in possession or others who the purchaser

60

reasonably believes know such facts. Overly v. Hixson, 82 A.2d 573, 575 (Pa. Super. 1951). "Proper notice requires a diligent search on the part of the purchaser, and that the question of diligence is a factual one to be determined by the accessibility of the records at the time of the search." First Citizens National Bank v. Sherwood, 817 A.2d 501, 502 (Pa. Super. 2003); See also Hermansen, p. 6-20 ("The depth of research is measured according to the amount of prior records for the property that must be examined.").

The issue in Sherwood was whether a subsequent purchaser of real estate had constructive notice of a mortgage lien where the mortgage lien was improperly indexed in the Recorder of Deeds office. The court, relying on 21 P.S. § 357[19], held that the determination of whether an incorrectly indexed mortgage provided sufficient notice to the subsequent purchaser is a factual question to be determined on a case by case basis. Sherwood, 817 A.2d at 505. The court noted that with the advent of the computerization of the property indexes "[w]hat may have been considered a diligent search may no longer be considered because of the ease of retrieving computerized information relevant to encumbrances on the property." Sherwood, 817 A.2d at 505. The court further elaborated by writing,

> [i]f the records are not computerized or are not easily accessible, then the finder of fact may conclude a search of the index is sufficient. If, on the other hand, the records are easily accessible, then a diligent search may require review of these records. We hold that if the fact finder concludes under an objective standard of reasonableness that a diligent search has been made, then the result of that search shall constitute notice.

---

[19] 21 P.S. § 357 entitled "Constructive Notice as to Recordation" provides

The legal effect of the recording of such agreements shall be to give constructive notice to subsequent purchasers, mortgagees, and/or judgment creditors of the parties to said agreements of the fact of the granting of such rights or privileges and/or of the execution of said releases, and the rights of the subsequent purchasers, mortgagees, and/or judgment creditors of the parties to said agreements shall be limited thereby with the same force and effect as if said subsequent purchasers, mortgagees, and/or judgment creditors had actually joined in the execution of the agreement or agreements aforesaid.

Sherwood, 817 A.2d at 505; See also Hermansen, 6-20 ("The depth of research is measured according to the amount of prior records for the property that must be examined.").

Defendant J.R. Fraker argues, "[t]he main purpose—if not the sole purpose—of the recording statutes is to provide notice to all persons purchasing real estate or extending mortgage loans of the existence of all property interests affecting the real estate involved in the purchase or use[] as collateral for a loan." *J.R. Fraker's Propose Findings of Fact and Conclusions of Law, p. 75-76.* The Court agrees with this statement. However, the Court disagrees that the Defendants did not have notice. As the case law indicates, the extent of the search required to be a BFP is a matter of degree. As the Plaintiffs correctly point out, "[a]lthough JRF claims that he was represented by an unnamed attorney, we do not know the scope of the search, the extent of the attorney certification or what qualifications were made to any opinion of title." *Plaintiffs' Rebuttal to J.R. Fraker's Proposed Findings of Fact and Conclusions of Law, p. 16.* Defendant JRF argues, "these parties: (1) derived their title deeds from different grantors; and, (2) the title deed of record held by each party very specifically describes the property conveyed to them, including the specific acreage they were to receive; and, (3) at the TIME each party acquired their property an examination of the deed records would NOT have disclosed any ownership interest (or 'overlap') by an adjoining owner." *J.R. Fraker's Proposed Findings of Fact and Conclusions of Law, p. 82 (emphasis supplied).*

The Court is not in a position to speculate about the extent of a title search that was done years ago. At the very least, as the Court has already concluded, sufficient

62

circumstantial evidence existed to explain the breaks in the chains of title thereby providing constructive notice to the Defendants. Defendant JRF's argument that he derived title deeds from different grantors is unpersuasive because all of his claimed property was derived from the Mary Trotter patent. The simple fact remains that if the defendants conducted a thorough title search, they would have found the mistakes. Further, it is the Defendants as the party asserting the unrecorded rights in the property, who have the burden of establishing their unrecorded rights. Accordingly, the Defendants argument relating to BFP must fail.

### Adverse Possession

Adverse possession is defined as "dominion over the property." Bride v. Robwood Lodge, 713 A.2d 109, 112 (Pa. Super. 1998). The original purpose of adverse possession "was to clarify ('quiet') uncertain title rather than to serve as a reward for possession." Hermansen, 4-20. If a party is able to satisfy the requirements of adverse possession for the prescribed period of time, the adverse possessor gains an "absolute, marketable title, with the attendant right of possession." Plauchak v. Boling, 653 A.2d 671, 678 (Pa. Super. 1995). Stated another way, a party who successfully asserts adverse possession "extinguishes all prior claims, including those asserted under color of paper title." Id.

The elements for adverse possession have been well established—a claimant must prove actual, continuous, exclusive, visible, notorious, distinct and hostile possession of the land for twenty-one (21) years. Moore v. Duran, 687 A.2d 822, 828 (Pa. Super. 1996). The burden is on the person asserting adverse possession to establish each one of the elements. Conneaut Lake, 66 A.2d at 829.

63

Pennsylvania jurisprudence has adopted "'a rather strict standard for proving adverse possession of woodland.'" Shaffer v. O'Toole, 964 A.2d 420, 424 (Pa. Super. 2009) (quoting Rec. Land Corp. v. Hartzfeld, 947 A.2d 771, 774 (Pa. Super. 2008). The strict standard is required because adverse possession is an "'extraordinary doctrine'" and an "'extraordinary privilege.'" Recreation Land Corporation v. Hartzfeld, 947 A.2d 771, 774 (Pa. Super. 2007) (quoting Flannery v. Stump, 786 A.2d 255, 258 (Pa. Super. 2001)). Each adverse possession claim is a fact specific inquiry. Bride v. Robwood Lodge, 713 A.2d 109, 112 (Pa. Super. 1998).

Niles v. Fall Creek Hunting Club, Inc., 545 A.2d 926, 929 (Pa. Super. 1988) is directly on point and provides an excellent discussion of the differences between adverse possession and the doctrine of consentable lines; a similar yet distinct concept to adverse possession. In the case, Fall Creek Hunting Club acquired approximately 1,560 acres of unimproved woodlands. The deed to Fall Creek provided that the western boundary was defined as "the line dividing the Townships of Liberty and Morris." Niles, 545 A.2d at 928. This deed was executed in 1940. Niles owned the property to the west of the Fall Creek property. Niles traced the chain of title back to 1952 when there was a survey done. Niles learned that beginning in 1952, there were concerns with the exact location of the boundary line separating the Fall Creek and Niles properties. To separate the properties, a single strand of wire was placed between the properties and no trespassing signs were placed. Niles then used his portion of the property for timbering. In 1982, Fall Creek commissioned its own surveyor who concluded that the 1952 survey was incorrect and the correct line was 700 feet to the west of the 1952 survey. Fall Creek

64

then moved the no trespassing signs to reflect the new survey. Niles then commenced an action to quiet title and trespass against Fall Creek. The court on appeal held

> The land had been partially enclosed by a single strand of wire which had broken and fallen to the ground in several places. The evidence was insufficient to show an inclosure [sic] of a substantial character. There was neither the establishment of a residence nor cultivation within designated boundaries. Therefore, the evidence failed to satisfy the requisites for proving that Niles had acquired title to the woodland by adverse possession.

Id. at 930.

The Niles court then discussed the doctrine of consentable lines, which, the court noted, "emerged as a separate and distinct theory from that of traditional adverse possession." Niles, 545 A.2d at 930. A party may prevail under either theory. Id, at 931. The court noted that when the 1952 survey was done, the exact location of the western boundary was uncertain, and, therefore the parties included the language "the location of which is verbally agreeable to the adjacent landowners." Niles, 545 A.2d at 931. This language was subsequently incorporated into the later deeds. The court held that this language, if believed by the jury would become a binding, consentable line[20]. In ruling the court noted that "it was not essential an express agreement to recognize the line." Niles, 545 A.2d at 931. The writer shall take each element for adverse possession in turn.

The first element, actual possession, is as it states—actual possession is required and proof of constructive possession under the guise of color of title is insufficient. Inn Le'Daerda, Inc. v. Davis, 360 A.2d 209, 214 (Pa. Super. 1976). "Actual possession of property may be established in connection with the maintenance of a residence, by

---

[20] It must be noted that the Superior Court reversed the trial court on the basis of other errors the trial court committed such as a evidentiary rulings and jury instructions. The court concluded, "[t]his is a difficult case. Whether Fall Creek's record title to the disputed land must yield to Niles because of a boundary fixed by consentable line is a close question. Because the jury's verdict may have been influenced by misleading instructions on adverse possession and erroneous evidentiary rulings, a new trial is required." Niles, 545 A.2d at 934.

65

cultivation of the land, by [e]nclosure of the land, or by making improvements to the land and paying property taxes." Moore, 687 A.2d at 828; See also Parks v. Pennsylvania R.R. Co., 152 A. 682, 684 (Pa. 1930) ("temporary acts on the land, without an intention to seat it for residence and cultivation or other permanent use consistent with the nature of the property are not the actual possession required."). In "dealing with a woodland, a person must establish actual possession of the woodland by residence or cultivation of a part of the tract of land to which the woodland belongs. A property owner can satisfy this requirement by making ordinary use of the woodlands in connection with their residence or the part of the woodlands that is cultivated. Olewine v. Messmore, 18 A. 495, 496 (Pa. 1889); See also Bride v. Robwood Lodge, 713 A.2d 109, 112 (Pa. Super. 1998) ("Since the disputed parcel is undeveloped woodland, actual possession is established by either erecting a residence or by enclosing and cultivating the property."); Moore, 687 A.2d at 828 ("Actual possession may thus be established by enclosing and cultivating the tract of land of which the woodland is a part without erecting a residence; or possession may be established by erecting a residence where there is a clear designation of the boundaries of the land surrounding such residence."); Rittenhouse, 37 Pa. at 117 ("That actual possession may be by residence without cultivation, or by enclosure and cultivation without residence; and where either these is, the use of adjoining woodland by the disseisor, as farmers generally use woodland adjoining to their farms, is actual and not constructive possession of such woodland."). The Rittenhouse court further explained, "[t]he customary use of the woodland, in connection with such a possession, within the interference, becomes actual possession of the whole." Id., at 121.

66

However in Seven Springs Farm, Inc. v. King, 344 A.2d 641 (Pa. Super. 1975) the court held that timbering from an unenclosed woodland and constructing roads to facilitate the timbering did not satisfy the actual possession requirement. The Seven Springs court noted that a fence to satisfy the requirements of actual possession must be "substantial" and the fence must "define and enclose the acreage to which possession is asserted." Seven Springs, 344 A.2d at 644-45. Likewise in Bride, the court held that using the property sporadically for hunting, picking berries, removing timber and planting saplings many years ago was insufficient to demonstrate actual possession. Bride, 713 A.2d at 112. It must be noted that although using a land for recreational purposes such as hunting and fishing does not constitute actual possession, it may be sufficient where the use(s) is "extensive and apparent as where systematically conducted for commercial purposes." Seven Springs, 344 A.2d at 645.

The Court agrees with the Defendants that adverse possession has been satisfied for the land that has been improved. More specifically, Attorney Cramer deduced testimony that Plum Hollow never plowed or put shale down on a road purportedly owned by Defendants Larry J. and Tina M. Dillman. N.T. May 19, 2011, p. 117. The following exchange between Attorney Cramer and Allen Henry is instrumental:

Q.      Before we move on, who was in actual physical possession of the Dillman property when this action was filed by the plaintiffs in 2009?
A.      Dillman was in actual physical possession of whatever is inside the Mary Trotter boundary in my opinion.
        He occupied—it's my understanding he occupied the house and so he was also in physical possession of that house, but at the time he purchased [it] I understand the title was still in someone through Mary Trotter because the house was on the property that was conveyed to him by Fraker. The house is on that property.
Q.      Well, let me ask you this, did the hunting club ever down and plow out Dillman's driveway?
A.      No they didn't.

67

Q. Did the hunting club ever down and put shale on the Dillman's driveway as depicted on Exhibit I-1?

A. No they didn't.

Q. And the hunting club never maintained any portion of Dillman's front yard, did it?

A. No they didn't

N.T. May 19, 2011, p. 116.

Attorney Cramer introduced several photographs of the property allegedly owned by Defendants Dillman, Ramsey and Miller. See Exhibits I-2 through I-9. More specifically, Exhibit I-2 shows a gravel road in the middle of the photograph and there is a home on the right side of the picture. There are two (2) small structures in the picture one of which looks like a storage shed and a secure place to put out trash so as to prevent bears from rummaging through the trash. There is a wooded area behind the home and structures. All structures appear to be well maintained and the grass is neatly trimmed. Exhibit I-3 is a picture that appears to be taken immediately adjacent to Exhibit I-2 as the home that was on the right side of the photograph in I-2 is now in the center. There are three (3) vehicles parked in front of the home and another larger structure on the right side of the photograph. Again, all structures and vehicles appear to be well maintained. Exhibit I-4 shows a gravel road and in the center there is a mailbox with the name "D. Ramsey" on the mailbox. Both the mailbox and the mailbox post appear to be well maintained. Exhibit I-5 depicts a gravel road leading up to two (2) large structures, one of which appears to be a home and the other appears to be a garage. There is an American flag flying from the garage and there is a trampoline in the backyard of the home. The American flag is not tattered or faded in any way. Exhibit I-6 depicts a state road with a double yellow line down the middle and a mobile home in the front. There is also a red shed off on the right side of the picture. All structures appear to be well

68

maintained. Exhibit I-7 depicts several homes on the right side of the photograph and a road running parallel to the homes on the left side of the photograph. All of the yards are neatly trimmed and there is a sign in the front yard of one of the homes that say "Mobile Home for Rent". The sign and all homes appear to be well maintained. Exhibit I-8 depicts several mobile homes with neatly groomed yards. Exhibit I-9 depicts a mobile home and single family home on the property. Accordingly, the Court believes that the Defendants have satisfied the actual possession element for those areas that are improved.

JRF likewise testified about his use actual use of the land. More specifically, JRF explained how he worked with his son to subdivide the land that he bought in 1976. N.T. July 29, 2011, p. 14. JRF also testified that he cleared brush away from the property and timbered on the property so that the property could be marketed and sold. N.T. July 29, 2011, p. 15. JRF further testified that he put "For Sale" signs up on the parcels of land that he was attempting to sell. N.T. July 29, 2011, p. 15. JRF also rented mobile homes to people on the property. N.T. July 29, 2011, p. 16. Although JRF never personally lived in the homes, Bonnie Miller resided in the trailer continuously. N.T. July 29, 2011, p. 37. Again, the Court is convinced that Defendant JRF has satisfied his burden of demonstrating actual possession for these areas.

However, the question remains about the unenclosed woodlands. It is not clear that the Defendants have satisfied this element from the evidence deduced regarding the woodlands portion of the land they occupy. Rittenhouse case would allow for satisfaction of this element by proof of residence and use of the woodland. There is no evidence that the Defendants ever attempted to define and enclose the acreage to which possession is asserted. See Seven Springs. The Court notes that there appears to be little

69

dispute regarding the remaining elements for the improved areas presently occupied by the Defendants. Accordingly, the Court will allow the parties an opportunity to reach an agreement regarding the exact placement of the boundary lines.

### Doctrine of Consentable Lines

A similar, yet distinctly related topic to adverse possession is the doctrine of consentable lines which "is a rule of repose for the purpose of quieting title and discouraging confusing and vexatious litigation." Schimp, 659 A.2d at 1034; See also Plauchak v. Boling, 653 A.2d 671, 675 (Pa. Super. 1995); Plott v. Cole, 547 A.2d 1216 (Pa. Super. 1988) ("the doctrine of consentable line[s] has emerged as a separate and distinct theory from that of traditional adverse possession.").

Under the doctrine of consentable lines, adjoining landowners may reach a compromise as to the boundary using the principles of estoppel. Inn Le'Daerda Inc., 360 A.2d at 215. The doctrine was created to allow the parties to a boundary dispute, to resolve their differences peacefully in recognition of abandonment of their rights. Id.; See also Plauchak v. Boling, 653 A.2d 671, 675 (Pa. Super. 1995) ("The doctrine of consentable line is a rule of repose for the purpose of quieting title and discouraging confusing and vexatious litigation."). Not surprisingly courts favor this doctrine to resolve land disputes. Plauchak, 653 A.2d at 676. The doctrine is not a conveyance within the purview of the Statute of Limitations and, thus, must be demonstrated through parol evidence. Plauchak, 653 A.2d at 675.

Most of the cases read by the Court discussing the doctrine of consentable lines involved a dispute over the location of a fence or other boundary. See Schimp, 659 A.2d at 1034; Inn LeDaerda Inc., 360 A.2d at 214-215; But see Plauchak, 653 A.2d at 676

70

(Doctrine established when a row of hedges was in place for twenty-one (21) years); Plott v. Cole, 547 A.2d 1216 (Pa. Super. 1988) (Dispute over the location of a screening wall in half of a double frame house). However, for the doctrine to apply, the parties need not "*specifically*" consent to the location of the line. Plott, 547 A.2d at 1221 (emphasis supplied). More specifically,

> It cannot be disputed that occupation up to a fence on each side by a party or two parties for more than twenty-one years, each party claiming the land on his side as his own, gives to each an incontestable right up to the fence, and equally whether the fence is precisely on the right line or not. Our courts have always favored the settlement of disputes of this character by recognizing consentable lines established by the parties themselves, and without regard to whether the line agreed upon conforms to the exact courses, distances and bounds of the original surveys.

Plott, 547 A.2d at 1221 (quoting Dimura v. Williams, 286 A.2d 370 (Pa. 1972)); See also Sorg v. Cunningham, 687 A.2d 846, 849 (Pa. Super. 1997) (row of pine trees sufficient to establish a boundary line). Additionally, there is no requirement that the activities be conducted on the entire property for a party to prevail. Sorg, 687 A.2d at 849.

Broadly speaking, there are two (2) ways to prove the doctrine—first, by dispute and compromise, and, secondly by recognition and acquiescence. Schimp, 659 A.2d at 1034. Under either theory it is not necessary that the boundary line be substantial. Jedlicka v. Clemmer, 677 A.2d 1232, 1235 (Pa. Super. 1995).

The Court will first discuss the dispute and compromise method. For the Court to find that this doctrine is applicable under the dispute and compromise method, three (3) elements must be satisfied. First, there must be a "dispute with regard to the location of a common boundary line." Inn Le'Daerda Inc., 360 A.2d at 215. Second there must be an "establishment of a line in compromise of the dispute". Id. Lastly there must be "'the consent of both parties to that line and the giving up of their respective claims which are

71

inconsistent therewith.'" Id. (quoting Newton v. Smith, 40 Pa. Super. 615, 616 (1909)). Finally, like adverse possession, the party asserting the doctrine must be in possession for twenty-one (21) years. Schimp, 659 A.2d at 1034.

The second method is recognition and acquiescence. Unlike the first method, the parties need not have specifically consented to the line but rather "'[i]t must nevertheless appear that for the requisite twenty-one years a line was recognized and acquiesced in as a boundary by adjoining land owners.'" Niles, 545 A.2d at 930 (quoting Inn Le'Daerda, 360 A.2d at 216.

Based on the foregoing discussion, one thing becomes clear—for the doctrine to be applicable, there must a boundary. As the Plaintiffs correctly point out on Page 39, ¶ 47 of their brief, "[t]here is no consentable line between JMF and Plum Hollow because no controversy as to the location of the line ever existed and there is boundary fence between JMF and Plum Hollow or Henry." *Plaintiffs' Proposed Finding of Fact and Conclusions of Law, p. 39.*

The Court finds that the Defendants have not satisfied their burden of establishing the Doctrine of Consentable Lines because the Defendants have not established a boundary. Defendant JRF argues,

> [s]tarting in 1981, when PHHC acquired its property from the Kerns, the Hunting club posted its property line essentially along the survey line established by P.E. Larsen for all parties, as evidenced by the blaze tree line and other monuments of record to which Surveyor Englerth testified. The facts also established that both parties stayed on their respective sides of this line, even refusing requests, each to the other, to hunt or park on the other's property.

J.R. Fraker's Proposed Findings of Fact and Conclusions of Law, p. 98-99. However, the Defendants failed to satisfy their burden when they failed to produce any photographs or other documentation to support this argument.

72

## Failure to Join Indispensible Parties

The Defendants argue that the Plaintiffs' action must be dismissed because all indispensable parties have not been joined in this action. See *J.R. Fraker's Proposed Findings of Fact and Conclusions of Law, p. 59; Proposed Findings of Fact and Conclusions of Law of Defendant Janet M. Fraker, p. 32-33.*

The failure to join an indispensable party deprives the court of jurisdiction. E-Z Parks, Inc. v. Philadelphia Parking Auth., 521 A.2d 71, 73 (Pa. Commw. 1987). A party is indispensable "when he has such an interest that a final decree cannot be made without affecting it, or leaving the controversy in such a condition that a final determination may be wholly inconsistent with equity and good conscience." Id. Courts are guided by four (4) criteria established in Mechanicsburg Area School District v. Kline, 431 A.2d 953, 956 (Pa. 1981):

1.    Do the absent parties have a right or interest related to the claim?
2.    If so, what is the nature of the right or interest?
3.    Is that right or interest essential to the merits of the issue?
4.    Can justice be afforded without violating due processes rights of absent parties?

The Court finds that all of the indispensable parties have been included in this action as all of "indispensible parties" mentioned by the Defendants either own properties located outside the litigation or their rights have been extinguished through voluntary land transfers. Defendant JRF mentions the mortgagee holding a lien upon Defendant Ramsey's property. In support of this proposition Defendant JRF cites Concord Liberty Savings & Loan Assn, v. Freedman, 61 Pa. D. & C.2d 487, 490 (Lawrence Cty. 1972) wherein the court held that a defendant bank was an indispensable party to the action. However, as the Plaintiffs correctly point out, the Ramsey mortgage is not a part of the

73

record. Accordingly, this Court is prohibited from considering this mortgage. See Ney v. Ney, 917 A.2d 863, 866 (Pa. Super. 2007).

## Conclusion

This case demonstrates the importance of conducting a thorough title search. The value of a proper title search cannot be underscored. As stated by Hermansen, there are four (4) major reasons for a title search:

> One of the most important reasons is to isolate omissions in boundary information. There are an untold number of records that, as a result of recopying copies have omitted important boundary information. . . . A second reason a surveyor should research past records is to uncover errors in subsequent surveys. Third, when omissions and errors are found, in-depth research is frequently necessary to correct them. . . . In addition to omissions, errors, and corrections, the sequence of conveyancing must sometimes be determined.

Hermansen, p. 6-20 to 6-21.

This entire case could have been resolved many years ago had someone taken the time to perform a detailed title search and realized that the original Mary Trotter patent did not close. This case has been the largest and most comprehensive case for this Court in recent memory.

Accordingly, the following is entered:

74

# THE COURT OF COMMON PLEAS OF THE 39ᵗʰ JUDICIAL DISTRICT OF PENNSYLVANIA – FULTON COUNTY BRANCH

| | |
|---|---|
| Plum Hollow Hunting Club, Inc., and Douglas Henry, <br>     Plaintiffs <br><br>    vs. <br><br> J. Ronald Fraker, Dulce Burger Hall, Bonnie M. Miller, Michael R. Weaver and Rhonda R. Weaver, his wife, Duaine A. Ramsey, single, and Larry J. Dillman and Tina M. Dillman, his wife, <br>     Defendants | Civil Action <br><br> No. 376-2008 <br><br> Judge Douglas W. Herman |

| | |
|---|---|
| Plum Hollow Hunting Club, Inc., <br>     Plaintiff <br><br>    vs. <br><br> Larry J. Dillman and Tina M. Dillman, his wife, Bonnie M. Miller, widow, and Duaine A. Ramsey, single, <br>     Defendants | Civil Action <br><br> No. 274-2006 <br><br> Judge Douglas W. Herman |

| | |
|---|---|
| Plum Hollow Hunting Club, Inc., and Douglas Henry, <br>     Plaintiffs <br><br>    vs. <br><br> Janet M. Fraker <br>     Defendant | Civil Action <br><br> No. 40-2009 <br><br> Judge Douglas W. Herman |

## ORDER OF COURT

**AND NOW,** this 20ᵗʰ day of ~~September~~ October 2015, pursuant to Pennsylvania Rule of Appellate Procedure 1931(c),



**IT IS HEREBY ORDERED** that the Prothonotary of Fulton County shall promptly transmit to the Prothonotary of the Superior Court the records in these matters, along with the attached Opinion sur Pa. R. App. P. 1925(a).

*Pursuant to the requirements of Pa. R. Civ. P. 236 (a)(2),(b) and (d), the Prothonotary shall give written notice of the entry of this Order of Court, including a copy of this Opinion and Order of Court, to each party's attorney of record and shall note in the docket the giving of such notice and the time and manner thereof..*

FULTON COUNTY
PENNSYLVANIA
FILED

OCT 2 2 2015

PROTHONOTARY, CLERK OF COURTS,
CLERK OF ORPHANS COURT,
REGISTER OF WILLS, RECORDER OF DEEDS

By the Court,

_____
Douglas W. Herman, J.

The Prothonotary shall give notice to:
J. McDowell Sharpe, Esq.
William C. Cramer, Esq.
Donald L. Kornfield, Esq.
Michael R. Weaver and Rhonda R. Weaver
Duaine A. Ramsey
Larry J. Dillman and Tina M. Dillman
Bonnie M. Miller

# THE COURT OF COMMON PLEAS OF THE 39th JUDICIAL DISTRICT
## OF PENNSYLVANIA – FULTON COUNTY BRANCH

| | |
|---|---|
| Plum Hollow Hunting Club, Inc., and Douglas Henry, <br>             Plaintiffs <br><br> vs. <br><br> J. Ronald Fraker, Dulce Burger Hall, Bonnie M. Miller, Michael R. Weaver and Rhonda R. Weaver, his wife, Duaine A. Ramsey, single, and Larry J. Dillman and Tina M. Dillman, his wife, <br>             Defendants | Civil Action <br><br><br> No. 376-2008 <br><br><br> Judge Douglas W. Herman |

FULTON COUNTY
PENNSYLVANIA
FILED

OCT 2 2 2015

4:05 pm

PROTHONOTARY, CLERK OF COURTS,
CLERK OF ORPHANS COURT,
REGISTER OF WILLS, RECORDER OF DEEDS

| | |
|---|---|
| Plum Hollow Hunting Club, Inc., <br>             Plaintiff <br><br> vs. <br><br> Larry J. Dillman and Tina M. Dillman, his wife, Bonnie M. Miller, widow, and Duaine A. Ramsey, single, <br>             Defendants | Civil Action <br><br><br> No. 274-2006 <br><br><br> Judge Douglas W. Herman |

| | |
|---|---|
| Plum Hollow Hunting Club, Inc., and Douglas Henry, <br>             Plaintiffs <br><br> vs. <br><br> Janet M. Fraker <br>             Defendant | Civil Action <br><br><br> No. 40-2009 <br><br><br> Judge Douglas W. Herman |

## Opinion sur Pa. R. App. P. 1925(a)

This is a boundary dispute case involving Plaintiffs, Plum Hollow Hunting Club

("Hunting Club") and Douglas Henry ("Henry") (collectively referred to as "Plaintiffs"), and

Defendants, J. Ronald Fraker ("Fraker"), Bonnie M. Miller ("Miller"), Dulce Burger Hall ("Hall"), Michael R. Weaver and Rhonda R. Weaver ("the Weavers"), Duaine A. Ramsey ("Ramsey"), and Larry J. Dillman and Tina M. Dillman ("the Dillmans") (collectively referred to as "Defendants"). After a bench trial in the above-captioned cases, this Court issued an Interim Non-Appealable Order and Opinion which decided that pursuant to the Mary Trotter Patent the Plaintiffs hold legal title to those portions of land that overlap with the land described in the Defendants' deeds and concluded that the Defendants satisfied their burden of proving adverse possession for the land that has been improved. As questions remained regarding adverse possession of any unenclosed woodland adjoining the properties, the Court issued a subsequent Order and Opinion setting forth the boundary lines between the Defendants' and Plaintiffs' respective properties. The parties now appeal our decisions. For the reasons set forth below and throughout the issued opinions, we suggest the Superior Court affirm our decisions.

## PROCEDURAL HISTORY

On September 12, 2006 (no. 274 of 2006), November 14, 2008 (no. 376 of 2008), and February 5, 2009 (no. 40 of 2009) the Plaintiffs filed complaints. Answers were subsequently filed by the Defendants in the three cases.

The Court convened a bench trial on May 18 to May 20, 2011, July 26, 2011, July 29, 2011 and August 25, 2011. After consideration of the evidence of record and the arguments of counsel, the Court issued an Interim Non-Appealable Order and Opinion on February 6, 2014 ("Interim Opinion"). In that Opinion we concluded that pursuant to the Mary Trotter Patent the Plaintiffs hold legal title to those portions of land that overlap with the land described in the Defendants' deeds. Furthermore, we concluded that the Defendants' were entitled to ownership of the intersecting property by way of adverse possession of any improved land. The Court

2

purposely left undecided the location of the boundaries of the properties obtained by adverse possession to allow the parties to come to an agreement. Specifically, the Court did not decide whether the Defendants were entitled to ownership of any unenclosed woodland adjoining their properties. As the parties failed to come to an agreement the Court issued a subsequent Order and Opinion on January 28, 2015 ("AP Opinion"). In the AP Opinion, this Court set forth the boundary lines between the Defendants' and Plaintiffs' respective properties, finding that Fraker, Miller, Hall, Ramsey, and the Dillmans acquired title to all land described within their respective deeds that intersects with the Mary Trotter Patent by adverse possession.[1]

Several post-trial motions were filed in the three cases. At docket nos. 274 of 2006 and 376 of 2008, Plaintiffs filed a post-trial motion on February 9, 2015. Fraker filed a post-trial motion on February 17, 2015. Ramsey, the Dillmans, Miller, and Hall filed post-trial motions on February 18, 2015. At docket no. 40 of 2009, Plaintiffs filed a post-trial motion on February 18, 2015. Mark J. Hale, Cherry D. Hale, Steven L. Grissinger and Karen J. Grissinger, as successors in interest to Janet M. Fraker ("Janet Fraker Successors"), filed a post-trial motion on February 9, 2015. The Court subsequently denied all post-trial motions.

On June 17, 2015 the Court issued an Order certifying the case at docket no. 274 of 2006 for appeal pursuant to Pa. R.A.P. 341(c).[2] On that same date the Court issued an Order entering final judgment at docket no. 40 of 2009 and an Order entering verdict in favor of all Defendants.

On July 15, 2015 at docket no. 274 of 2006, Plaintiffs filed a Notice of Appeal followed by a Concise Statement of Matters Complained of on Appeal on July 31, 2015. At docket no.

---

[1] The Mary Trotter Patent is more fully described in the Interim Opinion.

[2] "When more than one claim for relief is presented in an action, whether as a claim, counterclaim, cross-claim, or third-party claim or when multiple parties are involved, the trial court or other governmental unit may enter a final order as to one or more but fewer than all of the claims and parties only upon an express determination that an immediate appeal would facilitate resolution of the entire case. Such an order becomes appealable when entered. In the absence of such a determination and entry of a final order, any order or other form of decision that adjudicates fewer than all the claims and parties shall not constitute a final order." Pa. R.A.P. 341(c).

3

376 of 2008, three appeals were filed. On July 15, 2015 Plaintiffs filed a Notice of Appeal followed by a Concise Statement of Matters Complained of on Appeal on July 23, 2015. On July 23, 2015 Fraker filed a Notice of Appeal followed by a Concise Statement of Matters Complained of on Appeal on August 14, 2015. On July 27, 2015 the Dillmans filed a Notice of Appeal; however, the Dillmans failed to file a Concise Statement of Matters Complained of on Appeal. At docket no. 40 of 2009 the Janet Fraker Successors filed a Notice of Appeal on July 13, 2015 followed by a Concise Statement of Matters Complained of on Appeal on August 5, 2015.

## DISCUSSION

The instant cases all involve similar factual and legal issues and thus we issue this 1925(a) opinion encompassing the five collective appeals filed by the parties. All of the issues raised by the parties were discussed in our two prior opinions, i.e., the Interim Opinion and the AP Opinion. We will delineate the issues raised by each party for each distinct case, followed by direction as to the location where the Superior Court will find the reasoning for our decision.

At docket no. 274 of 2006 the Hunting Club raises four issues on appeal, all pertaining to adverse possession. The Hunting Club asserts that the Court erred in: (1) determining that the Dillmans proved all necessary elements of adverse possession by clear and convincing evidence for the statutory period of 21 years; (2) determining that the Dillmans established adverse possession by way of tacking from their predecessor-in-title; (3) failing to find that the Dillmans' property adjoining Plum Hollow Hunting Club's real estate was unenclosed woodland and erred in finding that the Dillmans possessed adversely that encroachment area without construction of a residence or fencing the area of the boundary of their actual legal title; and (4) "determining that the southern and eastern deed boundaries of [the Dillmans' property] in common with the

4

[Hunting Club property] were established by survey reconstruction of Thomas Michael Englerth, when there was no showing of adverse possession along those boundaries, and [the Hunting Club] had superior title to [the Dillman's property] along these common boundaries in the area colored green on Plaintiffs' Exhibit 126 . . . whereas [the Dillmans] only had legal title to that portion of their deed included within the yellow depiction on Plaintiffs' Exhibit No. 126 . . ." The Court's reasoning as to the issues the Hunting Club now complains of was set forth in its previous opinions issued, i.e., February 6, 2014 Interim Opinion at pages 63 to 70 and AP Opinion issued on January 28, 2015. Thus, we direct the Superior Court's attention to those Opinions.

At docket no. 376 of 2008 Plaintiffs raise four issues on appeal, all dealing with adverse possession. Plaintiffs assert that the Court erred in: (1) granting adverse possession to Miller and Hall who never raised the issue of adverse possession through testimony or submission of other evidence; (2) determining that the Dillmans, Ramsey, Miller and Hall proved all necessary elements of adverse possession by clear and convincing evidence for the statutory period of 21 years; (3) determining that the Dillmans or Ramsey could tack from their predecessor-in-title for purposes of establishing adverse possession; and (4) failing to find as a material fact that the real estate of the Dillmans and Ramsey was unenclosed woodland in the area of their front yards that intersected Henry's real estate, and erred in finding that the Dillmans and Ramsey adversely possessed that encroachment area without construction of a residence or fencing the area outside of the boundary of their actual legal title. The Court previously discussed its reasoning for granting Miller and Hall adverse possession in the Interim Opinion at pages 63 to 70 and in the AP Opinion, and therefore we direct the Superior Court's attention to those Opinions.

5

At docket no. 376 of 2008 Fraker raises six issues on appeal. First, Fraker asserts the Court erred in its conclusion ". . . that pursuant to the Mary Trotter Patent the Plaintiffs hold legal title to those portions of land that overlap with the land described in the Defendants' deeds." The reasoning for the Court's conclusion is stated at length in the Court's Interim Opinion at pages 32 to 56. Second, Fraker claims the Court erred in finding that pursuant to the Mary Trotter Patent the Plaintiffs hold legal title to those portions of land that overlap with the land described in the Defendants' deeds because Fraker, the Dillmans, Ramsey, Miller and the Weavers were bona fide purchasers for value of the ground they acquired. This Court has previously discussed issues relating to bona fide purchasers in its Interim Opinion at pages 56 to 63, and therefore we direct the Superior Court to that Opinion. In his third issue, Fraker asserts the Court erred in concluding that Plaintiffs hold any legal title outside of the ground as specifically described within their title deeds of record because Plaintiffs: failed to specifically describe the location of any alleged residue of ground; failed to identify the particular Plaintiff who owns any alleged residue and the property lines encompassing the alleged residue; and failed to submit any proof of ownership. The Court's findings of fact and conclusions of law relating to Plaintiffs' legal title are delineated in the Interim Opinion at pages 32 to 56, in addition to the findings of fact outlined on pages 3 to 26. In his fourth issue, Fraker claims the Court erred in accepting into evidence the Mary Trotter patent and/or the King patent because: the King patent was not recorded among the deed records of Bedford or Fulton County; Plaintiffs' expert did not use the required surveying techniques to reconstruct the King patent; and a trial court lacks jurisdiction to correct errors within a patent. The Court has fully discussed its reasoning as to these issues throughout the Interim Opinion and directs the Superior Court to that Opinion at pages 32 to 56, in addition to the Court's findings of fact on pages 3 to 26. In his

6

fifth issue, Fraker asserts the Court erred in not concluding that all Plaintiffs' claims for reformation of their title deeds, to include ground outside of that as described within their title deeds of record, are tolled by the 21 year statute of repose. Assuming that Fraker intended to use the word "barred" rather than "tolled," we direct the Superior Court's attention to the Interim Opinion at pages 32 to 56. Lastly, Fraker asserts that the Court erred in not dismissing Plaintiffs' cause of action because all necessary and indispensable parties have not been included in the litigation. Having already discussed this issue we direct the Superior Court's attention to the Interim Opinion at pages 73 to 74.

At docket no. 40 of 2009, the Janet Fraker Successors allege that the Court erred in finding in its Interim Opinion that the Janet Fraker Successors did not satisfy their burden of establishing the doctrine of consentable lines because they did not establish a boundary. For a full discussion of this issue we direct the Superior Court's attention to the Interim Opinion at pages 70 to 72. The Janet Fraker Successors also claim that the Court erred in not recognizing the recording statute mandate that any interest in real property be recorded in the county deed records and any interest not recorded is deemed void as to a bona fide purchaser, which the Janet Fraker Successors claim they were. This Court has previously discussed issues relating to bona fide purchasers in its Interim Opinion at pages 56 to 63, and therefore we direct the Superior Court to that Opinion.

The Dillmans have failed to file a Concise Statement of Matters Complained of on appeal at docket no. 40 of 2009, thus preventing this Court from addressing any specific issues. Therefore, they have waived any issues on appeal.

## CONCLUSION

We submit that no errors were committed in this Court's decisions in these cases.

Therefore, this Court respectfully requests the Superior Court affirm this Court's decisions.